ORIGINAL

FILED
08 FEB 28 PM 3:27
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

SEYFARTH SHAW LLP
Stacy D. Shartin (SBN 58281) sshartin@seyfarth.com
Paul C. White II (SBN 213900) pcwhite@seyfarth.com
2029 Century Park East, Suite 3300
Los Angeles, California 90067-3063
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

Attorneys for Defendant
OTIS ELEVATOR COMPANY

'08 CV 0380 JLS RBB

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

BY FAX

| | |
|---|---|
| RUSSELL ANDERSON, Plaintiff, v. OTIS ELEVATOR COMPANY and DOES 1 through 100, Defendant. | Case No. __________ **NOTICE OF REMOVAL** (San Diego Superior Court Case No. 37-2007-00083686-CU-FR-CTL) Complaint Filed: December 13, 2007 Complaint Served: January 28, 2008 |

**TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA AND TO PLAINTIFF AND HIS COUNSEL OF RECORD:**

///
////
///
////



1 mam

**PLEASE TAKE NOTICE THAT** Defendant OTIS ELEVATOR COMPANY ("Otis") hereby files this Notice of Removal on two grounds: (1) diversity jurisdiction, and (2) federal question jurisdiction, pursuant to 28 U.S.C. Sections 1332, 1441 and 1446, in order to effect the removal of the above-captioned matter, which was commenced in the Superior Court of the State of California for the County of San Diego, and states that the removal is proper for the following reasons:[1]

**TIMELINESS OF REMOVAL**

1. On or about December 13, 2007, Plaintiff Russell Anderson ("Plaintiff") filed a Complaint against Otis, and Does 1-100 in the Superior Court of the State of California for the County of San Diego, Case No. 37-2007-00083686-CU-FR-CTL (the "Complaint").

///

///

///

---

[1] By removing this action to this Court, Otis in no way waives or consents to personal jurisdiction or venue, and hereby expressly reserves its right to challenge, among other things, personal jurisdiction and/or venue by way of motion, responsive pleading or otherwise. *See Dielsi v. Falk*, 916 F.Supp. 985, 994 (C.D. Cal. 1996) ("[A] defendant 'does not waive jurisdictional challenges by removing the case to federal court.' [Citation.]"). *See also S.E.C. v. Wencke*, 783 F.2d 829, 832 n. 3 (9th Cir. 1986) ("Federal Rule of Civil Procedure 12 abolished the distinction between general and special appearances when the Federal Rules were adopted in 1938.") (citing *Republic International Corp. v. Amco Engineers, Inc.*, 516 F.2d 161, 165 (9th Cir. 1975) ["Special appearances to challenge jurisdiction are no longer required in federal courts."]; *Hays v. United Fireworks Manufacturing Co.*, 420 F.2d 836, 844 n. 10 (9th Cir. 1969) ["Under federal practice a special appearance need not be filed in order to challenge jurisdiction."]; *Martens v. Winder*, 341 F.2d 197, 200 (9th Cir. 1969) ["Rule 12 ... eliminat[es] the distinction between general and special appearances."]). *See also* 5B Wright and Miller, *Federal Practice and Procedure* § 1344, at 30 (2004) ("[I]t no longer is necessary to appear specially or employ any particular set of words to challenge a federal court's personal jurisdiction, venue or service of process. [¶] Thus, technical distinctions between general and special appearances have been abolished and the rulemakers wisely concluded that no end is accomplished by retaining the terms in federal practice.").

2. Otis first received the Summons and Complaint through its designated agent for service of process on January 29, 2008. A true and correct copy of the Summons and Complaint and all other pleadings served on Otis by Plaintiff on January 29, 2008, is attached hereto as Exhibit "A."

3. This Notice of Removal is timely as it is filed within thirty (30) days of the receipt by a defendant of a copy of the Summons and Complaint in this matter. 28 U.S.C. § 1446(b).

4. Otis answered the Complaint on February 28, 2008. A true and correct copy of the Answer is attached hereto as Exhibit B.

**FEDERAL QUESTION JURISDICTION**
**BASED ON SECTION 301 PREEMPTION**

5. At all relevant times, Plaintiff was represented by the International Union of Elevator Constructors (the "Union") and the terms of his employment were governed by a collective bargaining agreement ("CBA") between Otis and the Union. Attached hereto as Exhibit C is a copy of the CBA.

6. This Court has original or supplemental jurisdiction under 28 U.S.C. Sections 1331 and 1367 over each of Plaintiff's claims in the Complaint, and thus this case may be removed by Defendants pursuant to 28 U.S.C. Section 1441.

7. Federal question jurisdiction arises out of the fact that Plaintiff's claims are preempted by Section 301 of the Labor Management Relations Act ("Section 301"). 29 U.S.C. § 185. Section 301 provides that: "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties without regard to the amount in controversy or without regard to the citizenship of the parties." *Firestone v. Southern California Gas Co.*, 219 F.3d 1063, 1065 (9th Cir. 2000), *rehearing denied* 281 F.3d 801 (9th Cir. 2002).

/ / /

8. Further, all state law claims raised by a union-represented employee that require interpretation of a collective bargaining agreement must be brought pursuant to Section 301. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). "The preemptive force of section 301 is so powerful that it displaces entirely any state cause of action for violation of a collective bargaining agreement . . . and any state claim whose outcome depends on analysis of the terms of the agreement." *Newberry v. Pacific Racing Association*, 854 F.2d 1142, 1146 (9th Cir. 1988); *see also Voorhees v. Naper Aero Club, Inc.*, 272 F.3d 398, 403 (7th Cir. 2001) (noting that Section 301 is one of "only two areas in which the Supreme Court has found that Congress intended completely to replace state law with federal law for purposes of federal jurisdiction.").

9. Section 301 has specifically been held to preempt California state law claims that are dependent upon interpretation of a collective bargaining agreement. *Firestone*, 219 F.3d at 1066-67. The same holding applies where the interpretation is required to evaluate the employer's defense to a plaintiff's state law causes of action. *See Audette v. International Longshoremen's and Warehousemen's Union*, 195 F.3d 1107, 1113 (9th Cir. 1999) (civil rights claim preempted where interpretation of agreement was required to evaluate employer's defense that it had a legitimate business reason for its actions). *See also Levy v. Skywalker Sound*, 108 Cal. App. 4th 753, 769 (2003) (claim for unpaid wages preempted because it "rest[ed] entirely" on a claim that Plaintiff was "entitled . . . to wages at the level set by the CBA.").

10. Here, Plaintiff claims that Otis offered him employment, including a pay raise and a promotion, and that it gave him "a two year exclusive working contract", but that Otis breached that alleged contract by firing him. (Complaint, ¶¶ 10, 12, 14, 22-25.) However, at all relevant times, the terms and conditions of Plaintiff's employment, including the substantive reasons for, and the procedural prerequisites to, the termination of Plaintiff's employment, were set by the CBA.

Therefore, at least one of Otis's defenses to these claims – that it had legitimate, non-fraudulent business reasons to terminate Plaintiff's employment, and that it followed the proper procedure in doing so – is dependent upon and inextricably intertwined with interpretation of the CBA between Otis and the Union.

11. The fact that that the Plaintiff did not refer to the CBA in the Complaint does not preclude removal on the basis of Section 301 preemption when the resolution of Plaintiff's claims turns on interpretation of provisions in the CBA. *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 997 (9th Cir. 1987) ("The district court . . . properly looked beyond the face of the complaint to determine whether the contract claim was in fact a section 301 claim for breach of a collective bargaining agreement 'artfully pleaded' to avoid federal jurisdiction."); *Schroeder v. Trans World Airlines, Inc.*, 702 F. 2d 189, 191 (9th Cir. 1983) ("Artful pleading by the plaintiff will not be allowed to conceal the true nature of the complaint.").

## REMOVAL ON THE BASIS OF DIVERSITY JURISDICTION

12. The Court has original jurisdiction of this action under 28 U.S.C. Section 1332(a)(1) and this action is removable for the additional reason that it is between citizens of different states, and the amount in controversy is in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs. 28 U.S.C. Section 1441(a).

13. **Plaintiff's Citizenship.** Plaintiff alleges, and Otis is informed and believes, that Plaintiff is, and at all times since the commencement of this action has been, a citizen and resident of the State of California, County of San Diego. (Complaint, 1). For diversity purposes, a person is a "citizen" of the state in which he is domiciled. *Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983). A party's residence is *prima facie* evidence of his domicile. *State Farm Mut. Auto Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994).

14. **<u>Otis's Citizenship</u>.** Otis is a corporation, and is now, and at all times since the commencement of this action has been incorporated under the laws of the State of New Jersey, with its principal place of business in the State of Connecticut. Pursuant to 28 U.S.C. Section 1332(c), "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

15. **<u>Doe Defendants' Citizenship</u>.** Pursuant to 28 U.S.C. § 1441(a), the residence of fictitious and unknown defendants should be disregarded for purposes of establishing removal jurisdiction under 28 U.S.C. § 1332. *Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1213 (9th Cir. 1980) (unnamed defendants sued as "DOES" are not required to join in a removal position). Thus, the alleged existence of Doe defendants 1 through 100, inclusive, does not deprive this Court of jurisdiction.

16. **<u>Amount-In-Controversy</u>.** While Otis denies any liability to Plaintiff, the amount-in-controversy requirement is satisfied because it is "more likely than not" that the amount in controversy exceeds the $75,000 jurisdictional minimum exclusive of interest and costs, as required by 28 U.S.C. § 1332(a). *Sanchez v. Monumental Life Ins. Co.*, 95 F.3d 856, 862 (9th Cir. 1996).

A. **<u>Damages</u>.** Plaintiff's Complaint alleges the following six (6) claims against Otis: (1) Fraud; (2) Breach of Contract; (3) Violation of Labor Code Section 970, *et seq.*; (4) Intentional Misrepresentation; (5) Negligent Misrepresentation; and (6) Negative Fraud/Fraudulent Concealment. The Complaint seeks, among other things, compensatory damages, general damages, punitive damages, double damages as provided in [California] Labor Code §972, and attorneys' fees. (Complaint, p. 9.) It is "more likely than not" that Plaintiff's alleged compensatory damages, alone, exceed the amount-in-controversy requirement because: (1) Plaintiff alleges that Otis promised to employ him as a "temporary mechanic" for two (2) years, but actually employed him for two (2)

months or less (Complaint, ¶ 11, 12, 14); (2) pursuant to the CBA, Otis pays "temporary mechanics" on an hourly basis; (3) a regular full-time "temporary mechanic" would be expected to work 4,000 "straight-time" hours over the course of two (2) years, in addition to required overtime; and (4) the product of the wage-rate for "temporary mechanics" provided in the CBA, multiplied by 4,000 hours, exceeds $75,000. Furthermore, the fact that Plaintiff is seeking double damages under California Labor Code §972 makes it even likelier that the amount in controversy in this case exceeds the jurisdictional requirement.

**B. Attorneys' Fees and Punitive Damages.** Attorneys' fees are properly considered in calculating the amount-in-controversy for purposes of removal on grounds of diversity jurisdiction. *See, e.g., Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) (claims for statutory attorneys' fees to be included in amount in controversy, regardless of whether such an award is discretionary or mandatory). In addition, a request for punitive damages must be taken into account for purposes of determining the amount in controversy where such damages are recoverable under state law. *Davenport v. Mutual Benefit Health and Accident Ass'n*, 325 F.2d 785, 787 (9th Cir. 1963); *Brady v. Mercedes-Benz USA, Inc.*, 243 F.Supp.2d 1004, 1009 (N.D.Cal. 2002).

17. Since diversity of citizenship exists between Plaintiff and Otis and the amount in controversy between them is well in excess of Seventy-Five Thousand Dollars ($75,000), this Court has original jurisdiction of the action pursuant to 28 U.S.C. Section 1332(a)(1). For this additional reason, it is proper to remove this action to this Court.

## SUPPLEMENTAL JURISDICTION

18. The remaining claims in the Complaint fall within this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, as they relate to and emanate from the same employment relationship between Plaintiff and Otis that is the subject of the federal question claims. All the pleaded claims thus emanate

from and form part of the same "case or controversy." Accordingly, by virtue of 28 U.S.C. § 1441, Defendant is entitled to remove all of Plaintiff's claims to this Court.

## VENUE

19. Without waiving Otis's right to challenge, among other things, personal jurisdiction and/or venue by way of motion, responsive pleading or otherwise (*see* footnote 1, *supra*), venue for this removed action lies in this Court pursuant to 28 U.S.C. Sections 1441, 1446(a), and 84(c). This action originally was brought in the Superior Court of the State of California for the County of San Diego, and the Plaintiff resides in the County of San Diego, State of California.

## NOTICE OF REMOVAL

20. This Notice of Removal will be promptly served on counsel for Plaintiff and filed with the Clerk of the Superior Court of the State of California for the County of San Diego.

21. In compliance with 28 U.S.C. Section 1446(a), true and correct copies of all process, pleadings, and orders served in this action are attached hereto as Exhibit "A." They are (1) the Summon; (2) the Complaint; and (3) all other pleadings served on Otis.

**WHEREFORE**, Defendant prays that this civil action be removed from the Superior Court of the State of California for the County of San Diego to the United States District Court for the Southern District of California.

DATED: February 28, 2008

SEYFARTH SHAW LLP
Stacy D. Shartin
Paul C. White II

By [signature]
Stacy D. Shartin

Attorneys for Defendant
OTIS ELEVATOR COMPANY

EXHIBIT A

**CT CORPORATION**
A WoltersKluwer Company

**Service of Process Transmittal**
01/29/2008
CT Log Number 513028689

**TO:** Patrick Corcoran
Otis Elevator Company
One Farm Springs
Farmington, CT 06032-

**RE:** **Process Served in California**

**FOR:** Otis Elevator Company (Domestic State: NJ)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Russell Anderson, Pltf. vs. Otis Elevator Company, et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Cover Sheet, Notice(s), Stipulation Form |
| **COURT/AGENCY:** | San Diego County, San Diego, Superior Court, CA<br>Case # 37200700083686CUFRCTL |
| **NATURE OF ACTION:** | Fraud - Breach of Contract - Defendants' negligently or intentionally misinformed plaintiff as to the availability of work, defendants' intent to offer work and defendants' intent to promote plaintiff |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 01/29/2008 at 13:40 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Frederick W. Gaston<br>Gaston & Gaston<br>222 Ash Street<br>San Diego, CA 92101<br>619-398-1882 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 01/29/2008, Expected Purge Date: 02/03/2008<br>Image SOP - Page(s): 16<br>Email Notification, Jacqueline Martin Jacqueline.Martin@otis.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |



Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**<br>STREET ADDRESS: 330 West Broadway<br>MAILING ADDRESS: 330 West Broadway<br>CITY AND ZIP CODE: San Diego, CA 92101<br>BRANCH NAME: Central<br>TELEPHONE NUMBER: (619) 685-6146 | |
| PLAINTIFF(S) / PETITIONER(S): Russell Anderson | |
| DEFENDANT(S) / RESPONDENT(S): Otis Elevator Company | |
| ANDERSON VS. OTIS ELEVATOR COMPANY | |
| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>37-2007-00083686-CU-FR-CTL |

Judge: Richard E. L. Strauss Department: C-75

**COMPLAINT/PETITION FILED:** 12/13/2007

**CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW**

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CASE NUMBER: 37-2007-00083688-CU-FR-CTL CASE TITLE: Anderson vs. Otis Elevator Company

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Alternative Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.1.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial

## ADR OPTIONS

**1) CIVIL MEDIATION PROGRAM:** The San Diego Superior Court Civil Mediation Program is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participant in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non- binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for county-referred mediation: $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

**2) JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court

**3) SETTLEMENT CONFERENCES:** The goal of a settlement conference is to assist the parties in their efforts to negotiate a settlement of all or part of the dispute. Parties may, at any time, request a settlement conference before the judge assigned to their case; request another assigned judge or a pro tem to act as settlement officer; or may privately utilize the services of a retired judge. The court may also order a case to a mandatory settlement conference prior to trial before the court's assigned Settlement Conference judge.

**4) OTHER VOLUNTARY ADR:** Parties may voluntarily stipulate to private ADR options outside the court system including private binding arbitration, private early neutral evaluation or private judging at any time by completing the "Stipulation to Alternative Dispute Resolution Process" which is included in this ADR package. Parties may also utilize mediation services offered by programs that are partially funded by the county's Dispute Resolution Programs Act. These services are available at no cost or on a sliding scale based on need. For a list of approved DRPA providers, please contact the County's DRPA program office at (619) 238-2400.

**ADDITIONAL ADR INFORMATION:** For more information about the Civil Mediation Program, please contact the Civil Mediation Department at (619) 515-8908. For more information about the Judicial Arbitration Program, please contact the Arbitration Office at (619) 531-3818. For more information about Settlement Conferences, please contact the Independent Calendar department to which your case is assigned. Please note that staff can only discuss ADR options and cannot give legal advice.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 330 West Broadway<br>MAILING ADDRESS: 330 West Broadway<br>CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827<br>BRANCH NAME: Central | |
| PLAINTIFF(S): Russell Anderson | |
| DEFENDANT(S): Otis Elevator Company | |
| SHORT TITLE: ANDERSON VS. OTIS ELEVATOR COMPANY | |
| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS (CRC 3.221)** | CASE NUMBER: 37-2007-00083686-CU-FR-CTL |

Judge: Richard E. L. Strauss

Department: C-75

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process. Selection of any of these options will not delay any case management time-lines.

- ☐ Court-Referred Mediation Program
- ☐ Private Neutral Evaluation
- ☐ Private Mini-Trial
- ☐ Private Summary Jury Trial
- ☐ Private Settlement Conference with Private Neutral
- ☐ Other (specify): ____________
- ☐ Court-Ordered Nonbinding Arbitration
- ☐ Court-Ordered Binding Arbitration (Stipulated)
- ☐ Private Reference to General Referee
- ☐ Private Reference to Judge
- ☐ Private Binding Arbitration

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) ____________

____________

____________

Alternate: (mediation & arbitration only) ____________

Date: ____________ Date: ____________

____________ ____________
Name of Plaintiff Name of Defendant

____________ ____________
Signature Signature

____________ ____________
Name of Plaintiff's Attorney Name of Defendant's Attorney

____________ ____________
Signature Signature

(Attach another sheet if additional names are necessary). It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, 3.1385. Upon notification of the settlement the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all un-served, non-appearing or actions by names parties are dismissed.

**IT IS SO ORDERED.**

Dated: 12/13/2007

____________
JUDGE OF THE SUPERIOR COURT

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, bar number, and address):
Frederick W. Gaston, 231179
Gaston & Gaston
222 Ash Street, San Diego, CA 92101
TELEPHONE NO.: (619) 398-1882 FAX NO.: (619) 398-1887
ATTORNEY FOR (Name): Plaintiff, RUSSELL ANDERSON

FOR COURT USE ONLY

2007 DEC 13 PM 3:18

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS: 330 West Broadway
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Hall of Justice

CASE NAME: ANDERSON v. OTIS ELEVATOR CO.

**CIVIL CASE COVER SHEET**

[✓] Unlimited (Amount demanded exceeds $25,000)
[ ] Limited (Amount demanded is $25,000 or less)

**Complex Case Designation**

[ ] Counter [ ] Joinder

Filed with first appearance by defendant (Cal. Rules of Court, rule 1811)

CASE NUMBER: 37-2007-00083686-CU-FR-CTL
JUDGE:
DEPT.:

*All five (5) items below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [✓] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states or countries, or in a federal court
   f. [ ] Substantial post-judgment judicial supervision
3. Type of remedies sought *(check all that apply)*:
   a. [✓] monetary b. [✓] nonmonetary; declaratory or injunctive relief c. [✓] punitive
4. Number of causes of action *(specify)*:
5. This case [ ] is [✓] is not a class action suit.

Date: 13 December 2007

Gaston & Gaston
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.





JAN-25-2008 12:08 PM GASTON & GASTON 6193981887 P.08

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

2007 DEC 13 PM 3:18

1-29-07 13:40

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
OTIS ELEVATOR COMPANY AND DOES 1 THROUGH 100;

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
RUSSELL ANDERSON

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Hall of Justice
330 W. Broadway
San Diego, CA 92101

CASE NUMBER: *(Número del Caso):* 37-2007-00083686-CU-PR-CTL

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Frederick W. Gaston, Gaston & Gaston, (619) 398-1882
222 Ash Street, San Diego, CA 92101

DATE: *(Fecha)* DEC 13 2007 Clerk, by *(Secretario)* SANDRA VILLANUEVA, Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: Otis Elevator Company

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☒ by personal delivery on *(date)*: 1-29-07



Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

SUMMONS

Code of Civil Procedure §§ 412.20, 465

American LegalNet, Inc. | www.USCourtForms.com

JAN-25-2008 12:09 PM GASTON & GASTON 6193981887 P.09

FREDERICK W. GASTON
STATE BAR # 231179
MATTHEW J. FAUST
222 ASH STREET
SAN DIEGO, CA 92101
TELEPHONE: (619) 398-1882
FAX: (619) 398-1887

ATTORNEY FOR PLAINTIFF
RUSSELL ANDERSON

2007 DEC 13 PM 3:18

SAN DIEGO COUNTY, CA

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SAN DIEGO**

37-2007-00083688-CU-FR-CTL

RUSSELL ANDERSON

**Plaintiff,**

vs.

**OTIS ELEVATOR COMPANY AND DOES 1 THROUGH 100;**

**Defendants.**

**COMPLAINT FOR DAMAGES:**

1. **FRAUD**
2. **BREACH OF CONTRACT;**
3. **VIOLATION OF LABOR CODE § 970 et seq;**
4. **INTENTIONAL MISREPRESENTATION;**
5. **NEGLIGENT MISREPRESENTATION**
6. **NEGATIVE FRAUD/FRAUDULENT CONCEALMENT**

Case No.:
Judge:
Dept:



JAN-25-2008 11:50 AM GASTON & GASTON 6193981887 P.02

COMES NOW, PLAINTIFFS RUSSELL ANDERSON who brings this action against the corporation OTIS ELEVATOR COMPANY and alleges as follows:

## GENERAL ALLEGATIONS

1) PLAINTIFF, RUSSELL ANDERSON, is an individual residing in the City of San Diego, County of San Diego, and State of California.

2) DEFENDANT, OTIS ELEVATOR COMPANY is a Corporation with a principal place of business in the County of San Diego, State of California and is licensed to do business in the State of California.

3) Plaintiff is ignorant of the true names and capacities of the Defendants sued herein under the fictitious names DOES 1 through 100, inclusive. Plaintiff is informed and believes that each of the Defendants was responsible in some manner for the current damages alleged in this Complaint.

4) At all times mentioned in the causes of action into which this paragraph is incorporated by reference, each Defendant, was the agent/employee of each and every other Defendant. In doing the things alleged in the causes of action to which this paragraph is incorporated by reference, each and every Defendant was acting within the course and scope of this agency and employment and was acting with the consent, permission, and authorization of each of the other Defendants. All actions of each Defendants alleged in the causes of action into which this paragraph is incorporated by reference were ratified and approved by the officers or managing agents of every other Defendants.

## FACTUAL BACKGROUND

5) Plaintiff RUSSELL ANDERSON (Anderson) began working for DEFENDANT OTIS ELEVATOR COMPANY (Otis) in 1998 in the State of Kansas.

6) Plaintiff was the only African American employed at this specific Otis shop.



JAN-25-2008 11:58 AM GASTON & GASTON 6192981887 P.03

7) During his employment with Otis, the working environment became hostile. Supervisors and fellow employees began to make comments and tell jokes directed at Plaintiff and based upon his race.

8) Statements include but were not limited to:

(a) "You need to go down south with the other boys because accidents happen every day and nobody is going to teach you nothing up here."

(b) Referring to music Plaintiff would listen to as "Jiggaboo music."

(c) "You come down my street and you won't make it down my street."

(d) Telling jokes which imply the last sight a black man sees before he dies are hooded Ku Klux Klan members.

9) On or about January, 2004 Plaintiff filed a complaint with the EEOC. Subsequent to this filing, the working environment became increasingly hostile.

10) In or about October, 2004, as the EEOC and internal investigations were underway, Plaintiff received an unsolicited call from a supervisor in an Otis shop located in Los Angeles. The supervisor extended an offer to Plaintiff that included a pay increase, promotion to the position of "temporary mechanic" and a new working environment in the Los Angeles area.

11) On or about November 2004, Plaintiff accepted the offer and moved to Los Angeles to begin work. When he arrived, he was informed that his supervisor had signed him in, prior to his arrival, as a "temporary mechanic."

12) On his first day of work, Plaintiff was given a two year exclusive working contract with Defendant.

13) In December of 2004, Plaintiff's EEOC complaint, which was filed in Kansas, was dismissed because Plaintiff now worked and resided in Los Angeles.

14) In January of 2005, Plaintiff was fired. Plaintiff was told he was fired because "he was not a temporary mechanic."

FIRST CAUSE OF ACTION

FRAUD

AGAINST ALL DEFENDANTS

15) Plaintiff hereby incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

16) As set forth above, Defendants falsely and fraudulently represented to Plaintiff that a new job and promotion awaited him in Los Angeles.

17) The representations made by Defendants were in fact false. The true facts were that:

a.) Defendant never intended to have Plaintiff work with Defendant in the Los Angeles area.

b.) Defendants never intended to give Plaintiff a promotion.

c.) The sole purpose of offering Plaintiff a promotion and new potion in the Los Angeles area was to induce Plaintiff to leave the Kansas area and abandon his EEOC complaint against the company.

18) When Defendants made these representations they knew them to be false; Defendants' representations were made with the intent to defraud and deceive Plaintiff and to induce Plaintiff to act in the manner herein alleged. Further, at the time Defendants made the promises to Plaintiff, Defendants had no intention of performing the promises.

19) Plaintiff, at the time this promise was made and at the time the Defendants took the actions herein alleged, had no knowledge or understanding of Defendants' secret intention not to perform as claimed, and could not, in the exercise of reasonable diligence, have discovered Defendants' secret intention. In reliance on these representations, Plaintiff was induced to and did sell personal property, leave his residence in Kansas, and set up a new residence in the Los Angeles area. If Plaintiff had known of the actual intentions of Defendants, Plaintiff would not have taken such action.

20) As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Plaintiff was damaged in a sum to be determined through proof at trial but which exceeds the minimum jurisdiction of this court.

21) In doing the acts herein alleged, Defendants acted with oppression, fraud, and malice, and Plaintiff is entitled to punitive damages with a sum to be determined through proof at trial.

**SECOND CAUSE OF ACTION**

**BREACH OF CONTRACT**

**AGAINST ALL DEFENDANTS**

22) Plaintiff hereby incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

23) Plaintiffs have performed all of their obligations under the contract, except for those obligations from which they were excused.

24) Defendant has refused to employ Plaintiff, to offer him work, or promote him to the level of "temporary mechanic." Further, they have negligently or intentionally misinformed Plaintiffs as to the availability of work, Defendants' intent to offer work, and Defendants' intent to promote Plaintiff.

25) As a direct and proximate result of Defendants' aforementioned breaches, Plaintiff has suffered a loss of income, loss of personal property, loss of real property, harassment, and has incurred general damages including, but not limited to the cost of legal counsel.

///

///

///

///

///

///

**THIRD CAUSE OF ACTION**

**VIOLATION OF LABOR CODE § 970 ET SEQ**

**AGAINST ALL DEFENDANTS**

26) Plaintiff hereby incorporates by reference each and every paragraph of this complaint as if fully set forth herein.

27) Defendants, and each of them, did directly and indirectly, influence, persuade, and engage Plaintiff to change from a place outside this State (Kansas) to a place within this State (Los Angeles), for the purpose of working in a branch of labor, through and by means of knowingly false representations, which were spoken and written concerning the kind, character, and existence of such work; the length of time such work will last and the compensation thereof.

28) Specifically, Defendants represented to Plaintiff that if he were to move from Kansas to Los Angeles, he would have a new area to work for at least two years, and would be given a promotion to "temporary mechanic." These representations were false as Defendants' true intent was to lure Plaintiff out of Kansas in an effort to escape liability associate with an EEOC claim filed by Plaintiff in that State.

**THIRD CAUSE OF ACTION**

**INTENTIONAL MISREPRESENTATION**

**AGAINST ALL DEFENDANTS**

29) Plaintiff hereby incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

30) During the course of their business relationship, as set forth above, Defendants made numerous and repeated misrepresentations to Plaintiff.

31) Defendants made the aforementioned representations, thereby inducing Plaintiff to rely upon them and to act or refrain from acting in reliance upon them.

32) At the time the aforementioned representations were made, Plaintiff was ignorant of Defendants' misrepresentations and believed them to be true. Plaintiff relied on Defendants' promises by, among other things, moving to California and abandoning his claim with the EEOC.

33) Plaintiff did not discover the fraudulent nature of Defendants' misrepresentations until after Defendants had caused Plaintiff to move to California and abandon his EEOC complaint.

34) Plaintiff has suffered and will continue to suffer substantial harm and injury and Defendants will have been unjustly enriched if they are allowed to retain the above-described monies.

35) Plaintiff is informed and believes, and thereon alleges, that when Defendants undertook the aforementioned acts, they did so intentionally and with complete disregard of Plaintiff's rights, and did so with fraud, and such conduct was despicable. As a direct and proximate result, punitive damages should be awarded in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**AGAINST ALL DEFENDANTS**

36) Plaintiff hereby incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

37) During the course of their business relationship, Defendants made numerous and repeated misrepresentations to Plaintiff, as set forth above.

38) Defendants, and each of them, when they made their representations of fact to Plaintiff, as described and referenced in the preceding paragraphs, had no reasonable grounds for believing the representations to be true, and Defendants made the representations with the intent to induce Plaintiff to take the actions herein alleged. Defendants' representations were made with the intent that Plaintiff rely on them and Plaintiff did reasonably rely upon them to her detriment.

39) In making such representations of fact and in suppressing and failing to disclose facts material to Plaintiff's business relationship, as alleged above, Defendants negligently misled Plaintiff.

40) Defendants, and each of them, knew or reasonably believed Plaintiff would rely upon Defendants' misrepresentation of facts and Defendants' failure to disclose facts material to their interest. Plaintiff did rely, to his detriment, upon Defendants' representations and failure to disclose facts.

41) As a direct, foreseeable, and proximate result of Defendants' misrepresentations, Plaintiff has suffered and continues to suffer substantial losses in revenue, income and other benefits, all to his damage, in an excess of the minimum jurisdiction of this court, the precise amount of which will be proven at trial.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

**WHEREFORE** Plaintiff prays judgment against Defendants, and each of them, as follows:

1. For compensatory damages in an amount to be determined according to proof at trial;
2. For general damages in an amount according to proof at the time of trial;
3. For punitive damages;
4. For double damages as provided in Labor Code § 972;
5. For attorneys' fees;
6. For cost of suit incurred herein;
7. Joint and Several Liability;
8. For prejudgment interest at the legal rate; and
9. For such other relief as the Court may deem proper.

DATED:________________

________________________
GASTON & GASTON
MATTHEW J. FAUST
ATTORNEYS FOR PLAINTIFF



JAN-25-2008 12:08 PM GASTON & GASTON 6192981887 P.07

COPY

2008 FEB 28 PM 1:47

SEYFARTH SHAW LLP
Stacy D. Shartin (State Bar No. 58281)
Paul C. White II (State Bar No. 213900)
2029 Century Park East, Suite 3300
Los Angeles, California 90067-3063
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

Attorneys for Defendant
OTIS ELEVATOR COMPANY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

BY FAX

| | |
|---|---|
| RUSSELL ANDERSON, Plaintiff, v. OTIS ELEVATOR COMPANY and DOES 1 through 100, Defendant. | Case No. 37-2007-00083686-CU-FR-CTL<br>**ANSWER TO COMPLAINT FOR DAMAGES** |

Defendant Otis Elevator Company ("Defendant") hereby answers the unverified Complaint of Plaintiff Russell Anderson ("Plaintiff") as follows:

## GENERAL DENIAL

1. Pursuant to the provisions of California Code of Civil Procedure section 431.30(d), Otis denies, generally and specifically, each and every allegation, statement, matter and each purported cause of action contained in Plaintiff's Complaint, and without limiting the generality of the foregoing, denies, generally and specifically, that Plaintiff has been damaged in the manner or sums alleged, or in any way at all, by reason of any acts or omissions of Defendant.

///

## AFFIRMATIVE DEFENSES

2. In further answer to Plaintiff's Complaint, Defendant alleges the following affirmative defenses. In asserting these defenses, Defendant does not assume the burden of proof as to matters that, pursuant to law, are Plaintiff's burden to prove.

### FIRST AFFIRMATIVE DEFENSE

**(Failure to State a Cause of Action)**

3. The Complaint and each cause of action alleged therein fails to state facts sufficient to constitute claims upon which relief can be granted against Defendant.

### SECOND AFFIRMATIVE DEFENSE

**(Statute of Limitations)**

4. Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations, including but not limited to, Code of Civil Procedure sections 335.1, 337, 338, 339, and 340, the California Government Code, the Labor Management Relations Act, and Title VII of the Civil Rights Act.

### THIRD AFFIRMATIVE DEFENSE

**(Laches)**

5. Plaintiff has delayed inexcusably and unreasonably in the filing of this action causing substantial prejudice to Defendant, and thus, Plaintiff's claims are barred by the equitable doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE

**(Waiver and Estoppel)**

6. Plaintiff's Complaint, and each and every cause of action alleged therein, is barred by the doctrines of waiver and estoppel.

### FIFTH AFFIRMATIVE DEFENSE

**(Unclean Hands)**

7. Plaintiff's Complaint, and each and every cause of action alleged therein, is barred by the doctrine of unclean hands.

///

**SIXTH AFFIRMATIVE DEFENSE**

**(Good Faith)**

8. Plaintiff is not entitled to any penalty or double damages under the California Labor Code since, at all times relevant and material herein, Defendant did not willfully fail to comply with any provision of the Code, but rather acted in good faith and had reasonable grounds for believing that it did not violate the Code.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Pre-Emption)**

9. The terms and conditions of Plaintiff's employment were governed by a collective bargaining agreement between Defendant and the union that represented him, and therefore, his claim for breach of contract, and all claims arising out of Plaintiff's employment are pre-empted by Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185.

**EIGHTH AFFIRMATIVE DEFENSE**

**(Punitive Damages Claim Seeks an Excessive Fine/Violates Due Process)**

10. Any award of punitive damages as sought by Plaintiff would violate the due process and excessive fine clauses of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution, as well as the Constitution of the State of California.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Failure to Mitigate)**

11. To the extent Plaintiff has failed to mitigate his damages, if any, his claim for damages must be reduced.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Workers' Compensation Exclusivity)**

12. Plaintiff's claims for damages for mental, emotional, and/or physical injuries arising out of Plaintiff's employment are barred, in whole or in part, because they are precluded by the exclusivity provisions of California's Workers' Compensation Act, California Labor Code sections 3200, et seq, or any other applicable workers' compensation statute.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(After-Acquired Evidence)**

13. Plaintiff's claims are barred, and/or his damages are reduced to the extent that evidence is developed through discovery or at trial that Plaintiff engaged in any fraud or misconduct while employed by Defendant that, if known, would have caused Defendant to terminate Plaintiff's employment.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(Failure to Exhaust)**

14. To the extent Plaintiff purports to state or to refer to alleged acts of discrimination or harassment as separate legal claims or in support of any other legal claims, said references and claims are barred because Plaintiff failed to exhaust the applicable administrative prerequisites.

**PRAYER**

Wherefore, Defendant prays for judgment as follows:

1. That Plaintiff take nothing by his Complaint;
2. That judgment be entered in favor of Defendant and against Plaintiff on all causes of action;
3. That Defendant be awarded reasonable attorney fees according to proof;
4. That Defendant be awarded its costs of suit incurred herein; and
5. That Defendant be awarded such other and further relief as the Court may deem appropriate.

DATED: February 28, 2008

SEYFARTH SHAW LLP
Stacy D. Shartin
Paul C. White II

By [signature]
Stacy D. Shartin

Attorneys for Defendant
OTIS ELEVATOR COMPANY

## PROOF OF SERVICE

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN DIEGO )

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Seyfarth Shaw LLP, 2029 Century Park East, Suite 3300, Los Angeles, California 90067-3063. On February 28, 2008, I served the within documents:

ANSWER TO COMPLAINT FOR DAMAGES

☒ I sent such document from facsimile machine (310) 201-5219 on February 28, 2008. I certify that said transmission was completed and that all pages were received and that a report was generated by facsimile machine (310) 201-5219 which confirms said transmission and receipt. I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the parties listed below.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed Federal Express envelope with postage paid on account and deposited with Federal Express at Los Angeles, California, addressed as set forth below.

☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed Overnite Express envelope with postage paid on account and deposited with Overnite Express at Los Angeles, California, addressed as set forth below.

☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

☐ electronically by using the Court's ECF/CM System.

FREDERICK W. GASTON
MATTHEW J. FAUST
222 Ash Street
San Diego, CA 92101
Telephone: 619/398-1882;
Facsimile: 619/398-1887

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than on day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 28, 2008, at Los Angeles, California.

Denise R. Wasko-Peña

EXHIBIT C

# OTIS ELEVATOR COMPANY AGREEMENT

WITH
INTERNATIONAL UNION
of
ELEVATOR CONSTRUCTORS

**July 9, 2002 to**
**July 8, 2007**

# OTIS ELEVATOR COMPANY AGREEMENT

WITH
INTERNATIONAL UNION
of
ELEVATOR CONSTRUCTORS

**July 9, 2002 to**
**July 8, 2007**

Whenever any words are used in this Agreement in the masculine gender they shall be construed as though they are also used in the feminine gender or neuter gender in all situations where they would so apply.

# INDEX

ARTICLE


I Parties to the Agreement .......... 1
II Recognition Clause .......... 1
III Membership Requirements .......... 2
IV Work Jurisdiction .......... 4
IV(A) Systems, Modular and Industrial Structure .......... 13
V Wages .......... 15
VI Holidays .......... 18
VII Construction Work .......... 20
VIII Repair Work .......... 23
VIII (A) Modernization Work .......... 27
IX Contract Service .......... 30
X Designation of Helpers Work and Qualifications .......... 36
XI System of Payment .......... 39
XII Vacations .......... 41
XIII Traveling Time and Expenses .......... 43
XIV Strikes and Lockouts .......... 45
XV Arbitration .......... 46
XVI Jurisdictional Territory .......... 50
XVII Health Benefit Plan .......... 51
XVIII Pension Plan .......... 53
XVIII (A) 401 (k) Annuity .......... 56

**XIX Educational Fund** .......................... .57

**XX Elevator Industry Work Preservation Fund** ..... .59

**XXI Payment for Lost or Stolen Tools** ............ .61

**XXI (A) Metric Tools** ........................ .62

**XXII Hiring, Layoffs and Transfers** .............. .62

**XXIII Scope and Terms of Agreement** ............ .68

**XXIV Re-Opening Clause** ...................... .68

**XXV Termination of Agreement** ................. .69

**XXVI Local Option** ............................ .69

**XXVII Reporting Time, Subpoenaed Witnesses, Uniforms** ................ .70

**Appendix "A" Decisions of the Joint Industry Committee** ...................... .75

**Appendix "B" Apprenticeship Program**

**Letters of Agreement** ........................ .83

**Substance Abuse** ............................ .100

## ARTICLE I

### Parties to the Agreement

This Agreement, made by and between Otis (hereinafter referred to as "Otis" or the "Company" or the "Employer") and the INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS (hereinafter referred to as "IUEC" or the "Union"), for the purpose of establishing harmonious relations and facilitating peaceful adjustment of wage schedules and working conditions. The INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS makes this Agreement for and on behalf of its affiliated local unions and a list of the local unions for which the International negotiates and executes this Agreement is attached hereto and made a part hereof.

## ARTICLE II

### Recognition Clause

**Par. 1.** The Union claims and the Employer acknowledges and agrees that the Union has supplied proof that a majority of its Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices have authorized the Union to represent them in collective bargaining with the Employer.

The Employer recognizes the Union as the exclusive Section 9(a) bargaining representative for all Elevator Constructor Mechanics and Elevator Constructor Helpers and Elevator Constructor Apprentices (hereinafter referred to sometimes as "Mechanics, Helpers and Apprentices") in the employ of the Company engaged in the installation, repair, modernization, maintenance and servicing of all equipment referred to in Article IV, Par. 2 and Article IV (A).

**Par. 2.** The Union recognizes that it is the responsibility of the Company in the interest of the purchaser, the Company and its employees to maintain the highest degree of operating efficiency and to continue technical development to obtain better quality, reliability, and cost of its product provided, however, that this provision is not intended to affect the work jurisdiction specified in Article IV and other Articles of the Agreement.

## ARTICLE III

### Membership Requirements

**Par. 1.** All Mechanics, Helpers and Apprentices covered by this Agreement shall, as a condition of employment obtain and maintain membership in a local union of the International Union of Elevator Constructors on and after the thirtieth (30th) day following the beginning of their employment or the date this Article becomes effective, whichever is later.

**Par. 2.** The Company shall be obligated under this Article, after it becomes effective as above provided, to terminate the employment of any employee who fails to obtain or maintain membership in a local union as required by this Article, upon receipt of a written request for such termination from his local union: except that the Company shall have the right to refuse such request if it has reasonable grounds for believing (1) that such membership is not available to the employee on the same terms and conditions generally applicable to other members, or (2) that membership has been denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.



**Par. 3.** Employees working in any state which prohibits the execution or application of Agreements requiring membership in a labor organization as a condition of employment have the right to join or refrain from joining the International Union of Elevator Constructors. Employees who decide not to join the Union, however, and who are covered by this Agreement shall, as a condition of employment, be required to pay a monthly service fee to the Union. The service fee shall be the employees prorata share of costs of collective bargaining and the handling of grievances and arbitrations. The service fee shall not include any prorata share of costs of items other than collective bargaining and handling of grievances and arbitrations, and under no circumstances will the service fee be used by the Union for any purpose other than to meet the expenses of collective bargaining and handling of grievances and arbitrations.

On and after the thirtieth (30th) day following the date of this Agreement or on and after the thirtieth (30th) day following the date of commencement of employment by an employee, whichever is later, regular tendering of the service fee shall be a condition of employment, subject to the rights of employees and obligations of parties under the law.

Service fees shall be payable on or before the first day of each month.

**Par. 4.** All of the provisions of this Article shall be effective to the extent permitted by applicable law.

## ARTICLE IV

### Work Jurisdiction

**Par. 1.** It is agreed by the parties to this Agreement that all work specified in Article IV shall be performed exclusively by Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices in the employ of the Company.

**Par. 2.**

(a) The handling and unloading of all equipment coming under the jurisdiction of the Elevator Constructor, from the time such equipment arrives at or near the building site, shall be handled and unloaded by the Elevator Constructors. Mechanical equipment such as a forklift or truck mounted swing boom may be used by the Elevator Constructors. A derrick, crane or material hoist can be used under the supervision of Elevator Constructors to handle and unload the heavy material described in Paragraph 5(a). Where unusual conditions are expected to exist prior to delivery of equipment at or near the building site in regard to handling and unloading of equipment in the primary or secondary jurisdiction of the local union, the Company shall contact the Local's Business Representative to make appropriate arrangements for the handling and unloading of such equipment. In areas outside the jurisdiction of the local union, the Company shall contact the Regional Director.

(b) The erecting and assembling of all elevator equipment to wit: electric, hydraulic, steam, belt, dumbwaiters, residence elevators, parking garage elevators (such as Bowser, Pigeon Hole, or similar types of elevators), shuttles, compressed air and handpower, automatic people movers, monorails, airport shuttles and like-named devices used in the transportation of people for short distances of travel (less than 5 miles), as well as vertical reciprocating conveyor systems.



(c) It is understood and agreed that the preassembly of all escalators, moving stairways and link belt carriers that may be done in the factory shall include the following:

1. Truss or truss sections with tracks, drive units, machines, handrail drive sheaves, drive chains, skirts on the incline sections but not curved sections, step chains and steps installed and permanently aligned.

2. Balustrade brackets may be shipped attached but not aligned.

3. Setting of all controllers and all wiring and conduit from the controller.

All other work on escalators, moving stairways and link belt carriers shall be performed in the field by Elevator Constructor Mechanics, Helpers and Apprentices either before or after the truss or truss sections are joined and/or hoisted and placed in permanent position. This includes any and all work not done in the factory.

The erecting and assembly of all theater stage and curtain elevator equipment and guides and rigging thereto, organ consoles and orchestra elevators shall be performed by Elevator Constructor Mechanics, Helpers and Apprentices.

(d) All wiring, conduit, and raceways from main line feeder terminals on the controller to other elevator apparatus and operating circuits. Controllers are not to be shipped from the factory with extended wiring attached thereto.

(e) The erecting of all guide rails.

(f) The installation of all grating under the control of the Company. The installation of all counterweight screens, overhead work, either wood or iron, and all material used for mounting of elevator apparatus in machine room, overhead or below.

(g) The drilling of overhead beams for attaching machines, sheaves, kick angles, and all other elevator equipment.

(h) The setting of all templates.

(i) All foundations, either of wood or metal, that should take the place of masonry.

(j) The assembly of all cabs complete.

(k) The installation of all indicators.

(l) The erecting of all electrical or mechanical automatic or semi-automatic gates complete.

(m) The hanging of all automatic or semi-automatic elevator hoistway doors, together with the installation of hangers and tracks.

(n) The installation of all devices for opening and closing, and locking of elevator car and hoistway doors and gates.

(o) The drilling of doors for mounting of closing devices.

(p) The drilling of angle supports for mounting of closing devices except one template hole.

(q) The drilling of sills for sill trips.

(r) The operating of temporary cars.

(s) The setting of all elevator pressure open or pit tanks.

(t) The setting of hydraulic power units (power units include: motor, pump, drive valve system, internal piping, muffler, internal wiring, controller and tank). Where power units arrive in parts, they shall be assembled at the job site. The wiring and piping to and between multiple hydraulic power units shall be performed at the job site.

(u) All air cushions with the exception of those built of brick or those put together with hot rivets.

(v) Landing door entrances.

**Par. 3.**

(a) Nothing contained in Article IV shall preclude the Company from preassembling and prefabricating the following:

(1) Temporary elevators

A temporary elevator is defined as a nonpermanent elevator installed prior to or during construction work inside or outside buildings. The assembly, disassembly and moving of temporary elevators from job to job or area to area may be accomplished in the most economical fashion provided, however, whatever work is required to be performed at the



job site in connection therewith shall be performed exclusively by Elevator Constructor Mechanics, Helpers and Apprentices.

(2) Residence elevators

Residence elevators shall mean elevators installed solely for use in a single-family residence and not for general public use. Single-family residences may be part of a multi-unit structure.

(3) Dumbwaiters

(4) Dock elevators

(5) Parking garage elevators (such as Bowser, Pigeon Hole or similar types of elevators)

(6) Apartment House elevators

Apartment house elevators shall mean an elevator installed in a multi-unit, multifamily structure, (excluding condominiums) but not to exceed three (3) stories in height (i.e. 36 ft.) and the elevator shall not make more than three (3) stops nor exceed a capacity of 2500 lbs.

(7) Preassembled plug connectors may be used to interconnect the solid state components of the elevator systems (solid state to solid state only), and to connect any component in and on the car (excluding traveling cable).

When the use of fiber optics is applied to the elevator system, preassembled plugs/coupling devices may be used to maintain the integrity of the connection(s).

It is understood and agreed that the connecting and/or coupling of devices will be done by the Elevator Constructor whether accomplished by external wiring or preassembled plug connectors as provided in this Paragraph.

(8) Limited Use/Limited Access Elevators which shall mean elevators described under the scope of Limited Use/Limited Access Elevators as defined in A.S.M.E. A17.1.

Incline stairway chair lifts and incline and vertical wheelchair lifts shall mean lifts described under the scope of A.S.M.E. A17.1.

Limited Use/Limited Access Elevators, incline stairway chair lifts, inclined and vertical wheelchair lifts, and residence elevators may be installed in the most economical fashion, provided there is no factor of safety involved. Whatever work is required to be performed at the job site in connection therewith shall be performed exclusively by Elevator Constructor Mechanics, Helpers and Apprentices.

(9) Landing door entrance assemblies which will be limited to struts, sills, headers, frames and associated hardware for installation purposes: door header including tracks, hangers, and all relating devices (adjusting and aligning to be done in the field).

(10) Car-top inspection station which may only include pre-wired service light, gate switch, alarm device and inspection station.

(a) Pre-wired canopies with lights and fans.

**Par. 3 (b)** It is understood and agreed that the preassembly and/or prefabrication of electric walks, Trav-o-lators, speed ramps or similar type of moving walks, (limited to 15° incline per ANSI Code), shall include the following:

(1) Truss sections with drive units, machines, handrail drive sheaves and drive chains installed and aligned.

(2) Truss sections with tracks installed and aligned.

(3) Balustrade brackets may be shipped attached but not aligned.

(4) Setting of all controllers and all wiring and conduit from controllers.

Work to be done in the field shall include setting and aligning of truss sections and supports, installation of pallets (platforms and belting), handrails, handrail idler sheaves, centering guides, combplates, balustrades and trim

**Par. 4.**

(a) It is agreed that when sinking, drilling, boring or digging cylinder wells for hydraulic lifts, hydraulic elevators or



screw lifts, the Company shall employ Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices.

(b) On any job where the Company subcontracts the sinking, drilling, boring or digging of cylinder wells for hydraulic lifts, hydraulic elevators or screw lifts, one Elevator Constructor Mechanic shall be employed by the Company to supervise and assist in any and/or all work related to sinking, drilling, boring or digging of the cylinder well including the installation of the casing whether its sections be welded, screwed or riveted or by any other method joined.

(c) It is agreed that the work performed by the subcontractor shall be strictly limited to work in connection with the digging of the hole and the installation of the casing. It is understood that the Company will have the preceding sentence inserted in his contract with the subcontractor.

(d) The Company shall have the Elevator Constructor Mechanic on the job at the time the subcontractor arrives on the job for the drilling of the hole and during the entire time the subcontractor performs any work in connection with the drilling of the hole including the setting up and/or assembly and disassembly of the rig.

(e) If the Company violates the requirement defined in Par. (d) it shall be assessed and pay as liquidated damages a sum equal to double the total compensation of the Elevator Constructor Mechanic in the area for the number of hours an Elevator Constructor Mechanic should have been on the job and was not on the job in the sinking, drilling, boring or digging the cylinder well. This liquidated damage shall be paid by the Company to the said jointly administered trust fund.

In the case of a second offense, the liquidated damages shall be computed on the same basis as the first offense, except that the amount shall be tripled instead of doubled; for the third and subsequent offenses during the term of this Agreement, the liquidated damages shall be $500 more than the second offense.

The Company's Regions shall constitute separate areas for the counting of repeated violations by the Company and only violations in the same district shall be counted for the purpose of imposing graduated penalties.

(f) Should a work stoppage or strike occur because of a dispute over the application or interpretation of this paragraph none of the foregoing penalties will be imposed.

**Par. 5**

(a) Where heavy material is to be hoisted or lowered outside of the structure, a derrick, crane or material hoist can be used under the supervision of Elevator Constructors in the employ of the Company. Heavy material under subparagraph (a) is confined to machines, controllers, generators, trusses, or sections of trusses, plungers and cylinders. (Where multiple sections of cylinders and plungers are used, they shall be connected in the field by Elevator Constructors. Exception: Otis's multiple sections of cylinders may be connected either in the field or factory up to thirty-eight (38) feet in length; where multiple sections of plungers are used, they shall be connected in the field by Elevator Constructors.) In addition to the foregoing, the company shall have the right to utilize derricks, cranes or a material hoist to hoist or lower tools of the trade, gang boxes, welders, air and gas tanks, cutting torches, material handling equipment and safety equipment.

(b) Where conditions are such that the following heavy material can be hoisted up the hoistway, it shall be hoisted by the Elevator Constructors. Where conditions are such that the following heavy material cannot be hoisted up the hoistway, it can be hoisted with a crane or material hoist under the supervision of Elevator Constructors. Heavy material under subparagraph (b) is confined to beams, sheaves, bundles of rails and preassembled landing door entrances.

(c) The above heavy material in subparagraphs (a) and (b) shall be hoisted separately with the exception of plungers



and cylinders, rails, beams, preassembled landing door entrances and where conditions warrant machines with beams, which may be hoisted together.

(d) All other material is to be hoisted or lowered by Elevator Constructors without the use of derrick or crane.

**Par. 6.** The wrecking or dismantling of elevator plants shall be performed by Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices. It is understood and agreed that the Union reserves the right to refuse to install any new elevators in any plant where the wrecking or dismantling of the old elevator plant has been done by other than Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices. Before the local union shall refuse to install a new elevator, such action must be first approved by the International. Elevator plants as referred to in this paragraph are understood to include elevators, escalators, moving stairways, dumbwaiters, moving walks and all other equipment coming under the jurisdiction of the Elevator Constructor.

**Par. 7.** Where Elevator Constructor Mechanics are not available to lay car floor covering, it is agreed that the Company may employ others to do this work.

**Par. 8.** Inserts and/or bond blocks are to be set by Elevator Constructor Mechanics in the primary jurisdictions of local unions at the option of the Company. Inserts may be set by others outside of the primary jurisdictions of local unions where a full day's work cannot be provided.

**Par. 9.** No restrictions shall be imposed as to methods, tools, or equipment used.

**Par. 10.** It is agreed that the work specified in Article IV has always been performed exclusively by Elevator Constructor Mechanics, Helpers and Apprentices in the employ of the Company at the site of the installation. It is agreed that effective July 9, 1977, the work specified in Article IV that is performed exclusively by Elevator Constructor Mechanics, Helpers and Apprentices may be performed at the site of the installation or at another assembly point provided that (1) the assembly point is not in or adjacent to the Company's manufacturing facility, (2) the assembly point is within the primary or secondary jurisdiction of the local union in whose jurisdiction the site of installation is located, and (3) the work is performed by Elevator Constructor Mechanics . Helpers and Apprentices of the local union in whose jurisdiction the site of installation is located. If the site of installation is located outside the jurisdiction of a local union (in open territory), it is agreed that (1) the assembly point must be within twenty-five (25) miles of the site of installation, (2) the assembly point is not in or adjacent to the Company's manufacturing facility, and (3) the work is performed by Elevator Constructor Mechanics, Helpers and Apprentices from the local union who ordinarily perform work for the Company in the vicinity of the site of the installation. The unloading and handling of all equipment coming under the jurisdiction of the Elevator Constructor at an assembly point shall be performed in accordance with Par. 2(a) of this Article.

**Par. 11.**

(a) All differences and disputes concerning Article IV or Article IV (A) shall be settled in accordance with the grievance procedures in Article XV.

(b) While any question or dispute pertaining to Article IV or Article IV (A) is being processed the Company, where possible, shall assign the employees work other than the work in dispute. Where the work has progressed to a point



where it is not possible to perform work other than the work in dispute, then the employee shall perform the disputed work pending final resolution as provided herein.

## ARTICLE IV (A)

### Systems, Modular and Industrial Structures

**Par. 1.** Systems Building. Systems, modular, industrialized or similar structures are those whose superstructures and components are pre-assembled in sections, rooms, or floors, in whole or in part, in areas adjacent to or remote from the permanent site of the structure. The erection and assembly of elevator components in building modules is to be done by Elevator Constructor Mechanics, Helpers and Apprentices whether the assembly site is adjacent to the job or remote from the job. Where the Company has a choice or selection of the assembly site, such sites are to be mutually agreed upon by the General President of the International Union of Elevator Constructors and the Company. It is understood that if members of one local perform part of such work at an assembly site remote from the permanent job site, members of the local covering the permanent job site will perform the remainder of the work. The elevator work remaining to be done after modules have been put into permanent place, shall be performed by Elevator Constructor Mechanics, Helpers and Apprentices so that the jurisdiction of the Elevator Constructor as related to any other Building Trade, shall remain intact as outlined in the latest "Green Book" or "Plan for Settling Jurisdictional Disputes, Nationally & Locally" or its successor as approved by the Building & Construction Trades Dept., AFL-CIO.

**Par. 2.** The work to be done by Elevator Constructors is as follows:

(a) The installation and assembly of all machine room equipment whether overhead or below on prefabricated machine room floors.

(b) Assemble car frames and cabs complete with door operating equipment, control, signal and operating devices.

(c) Connect electric traveling cables to either car, controller or half-way junction box. The connections to be prepared and/or made at both ends of assembly site.

(d) Shackle hoist, compensating and governor cables and pre-connect to car or counterweight hitches.

(e) The setting of templates.

(f) The installation of all grating and counterweight screens, overhead work, either wood or iron, and all material used for mounting of elevator apparatus in machine rooms, overhead or below.

(g) All foundations, either of wood or metal, that should take the place of masonry.

(h) The installation and aligning of guide rails in hoistway modules.

(i) Erect and assemble doors, hangers, tracks, door locks or locking devices for opening or closing and all related equipment.

(j) Install corridor side operating and signal devices.

(k) Install hoistway wiring.

(1) Install all elevator equipment and devices in hoistway and hoistway modules including governor rope tension sheaves, control equipment, buffers and supports.

(m) The operating of temporary elevators.

(n) The installation and aligning of all pistons and cylinders on hydraulic elevators.

(o) Landing door entrances.

Unloading, handling, hoisting and lowering of material covered in (a) through (o) will be performed under the supervision of Elevator Constructors.



**Par. 3.** Nothing in this Article is intended to change the practices either party has previously enjoyed in erection of elevators in conventional type buildings as related to Article IV.

## ARTICLE V

### Wages

**Par. 1.** The rate of wages to be paid to Elevator Constructor Mechanics, Helpers and Apprentices shall be determined in accordance with the following: Effective January 1, 2003 the first (1st) Gross Increase shall have $3.00 added to the total package. Every twelve (12) months thereafter, during the term of this agreement, each local existing wage rate shall be increased $3.00 of total package according to the following schedule:

1st Year Gross Increase . . . . . . . . .$3.00
2nd Year Gross Increase . . . . . . . .$3.00
3rd Year Gross Increase . . . . . . . .$3.00
4th Year Gross Increase . . . . . . . .$3.00
5th Year Gross Increase . . . . . . . .$3.00

**Par. 2.** Subtracted from the gross increase shall be the credits agreed upon in Paragraph 3 below. The remainder shall be the wage rate increase for the Elevator Constructor Mechanics in that Local.

**Par. 3.** The amount of credits for wage rate increases effective January 1, 2003 and every twelve months thereafter shall be as follows:

| Current Wage Rate Amount Contribution Level $7.505 | Fringe | Total |
|---|---|---|
| 1st | $1.82 | $9.325 |
| 2nd | $1.01 | $10.335 |
| 3rd | $1.00 | $11.335 |
| 4th | $1.00 | $12.335 |
| 5th | $1.00 | $13.335 |

The above gross increases will be reallocated and the above credit amounts increased or decreased accordingly after the effective date of this Agreement by whatever different amounts, if any, the Union determines are necessary to fund the Health Plan, the Pension Plan, Annuity, Education Fund and Elevator Industry Work Preservation Fund by modifying the hourly contribution rate up to twenty-five (.25) cents per fund per year at the recommendation of the Joint Trustees.

**Par. 4.** Subtracting the credits from the gross increases yields the following wage rate increases for the Elevator Constructor Mechanic:

1st Year Wage Rate Increase .........$1.18

2nd Year Wage Rate Increase .........$1.99

3rd Year Wage Rate Increase .........$2.00

4th Year Wage Rate Increase .........$2.00

5th Year Wage Rate increase .........$2.00



**Par.5** The wage rate for the Elevator Constructor Helpers shall be seventy (70) percent of the Elevator Constructor Mechanic's rate.

**Par. 6.** The wage rate for Elevator Constructor Apprentices shall be the progressive scale of wages set forth below:

Probationary Apprentice,(0-6months): 50% of Mechanic's Rate

First Year Apprentice, (7-12 months): 55% of Mechanic's Rate, plus fringe benefits as provided by the collective bargaining agreement

Second Year Apprentice, (13-24 months): 65% of Mechanic's Rate, plus fringe benefits as provided by the collective bargaining agreement

Third Year Apprentice, (25-36 months): 70% of Mechanic's Rate, plus fringe benefits as provided by the collective bargaining agreement

Fourth Year Apprentice, (37-48 months): 80% of Mechanic's Rate, plus fringe benefits as provided by the collective bargaining agreement

**Par 7.** When four (4) or more men, including the Elevator Constructor Mechanic-in-charge, are employed on new construction or modernization jobs, the Elevator Constructor Mechanic-in-charge of the job shall have his hourly rate increased 12-1/2% for all hours worked.

**Par 8**. The wage rate of a given Local shall continue as long as satisfactory to both parties, but no change be made more often than twelve (12) months.

**Par 9.** The gross increases set out in this Article shall apply to all Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices engaged in construction, repair, modernization and contract service work, as defined and covered in this Agreement.

## ARTICLE VI

### Holidays

**Par. 1**. The following shall be designated as paid holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Veterans' Day, Thanksgiving Day, the Friday after Thanksgiving Day and Christmas Day.

**Par. 2.** In addition, each local may retain established unpaid holidays already agreed upon by past procedure or observed by local building trades councils or declared by State or National Governments. Any new Federal holidays such as President's Day and Columbus Day are not to be considered as paid or unpaid holidays unless previously celebrated by the parties to this Agreement.

**Par. 3**. To be eligible for a paid holiday, an employee must have been on the Company's payroll within the calendar week, Sunday to Saturday inclusive, previous to the week in which the holiday occurs. "On the payroll" means that an employee must have performed actual work or have been on an authorized paid vacation. If an employee desires to extend his vacation beyond the earned paid vacation period, such extension of that time shall not be considered as "on the payroll".



**Par. 4**. The holiday provisions of this Article shall apply to all Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices engaged in construction, repair, modernization and contract service work as defined and covered in this Agreement.

**Par. 5**. Eligible employees shall be paid for the regular workday and the paid holidays enumerated in Par. 1 at the regular straight time rate of the classification worked prior to the observance of the holiday. The rate of pay for all work performed on paid holidays shall be at the double time rate in addition to the holiday pay. Any unpaid holidays observed as provided in Par. 2 shall be without pay, but if worked shall be double time rate.

**Par. 6**. When a paid holiday falls on Saturday, it shall be observed on Friday. When a paid holiday falls on Sunday, it shall be observed on Monday.

**Par. 7**. The Company shall not lay off or terminate an employee to circumvent holiday pay as provided herein.

**Par. 8**. Employees who work on a holiday that falls on a Saturday or Sunday and that holiday is observed on a Friday or Monday, respectively, shall be paid at the specified over-time rates for work performed on Saturdays or Sundays. (i.e.: If July 4th falls on Saturday it will be celebrated on Friday, July 3rd. Work performed on July 3rd will be double time (2X) and work performed on July 4th will be paid at the specified overtime rate).

## ARTICLE VII

### Construction Work

**Par. 1.** Construction work is hereby defined as erecting and assembling of apparatus as enumerated in Article IV and Article IV (A) of this Agreement, except general repairs and modernization as defined in Article VIII and VIII (A). It is hereby agreed that all Construction Work as above defined shall be performed exclusively by Mechanics, Helpers and Apprentices.

**Par. 2.** It is agreed that the regular working day shall consist of eight (8) hours worked consecutively with an unpaid lunch period, between 6 A.M., and 5 P.M., five (5) days per week, Monday to Friday, inclusive. Hours of work at each job site shall be those established by the general contractor and worked by the majority of trades. (The above working hours may be changed by mutual Agreement as provided in Article XXVI.) if the general contractor shuts down operations on a day not recognized as a holiday under this Agreement, the Company shall make every effort to place the affected employees on other work for that day.

**Par. 2a.** Upon written notification to the Local Business Representative the company may establish hours worked on a job site for a four (4) ten (10) hour day workweek at straight time pay for construction work. It is agreed that the regular working day shall consist of ten (10) hours worked consecutively with an unpaid lunch period, between 6 A.M. and 6 P.M., four (4) days per week, Monday to Thursday, inclusive. Any work performed on Friday, Saturday and Sunday and before and after the regular working day on Monday to Thursday where a four (4) ten (10) hour day workweek has been established, will be paid double the rate of single time.



When working in a per diem area and work continues on the same job site the following week, the employee shall receive per diem for Friday, Saturday and Sunday.

It is agreed that when a Holiday falls on Sunday to Thursday, it shall be observed on the day of the Holiday or per Article VI Par.6 and, providing the employee complies with Article VI Par.3, he/she will be paid ten (10) hours for that Holiday. If the Holiday falls on Friday or Saturday, the employee will be paid eight (8) hours for that Holiday.

**Par. 3.** Work performed on Construction Work on Saturdays, Sundays and before and after the regular working day on Monday to Friday, inclusive, shall be classed as overtime, and paid for at double the rate of single time.

**Par. 4.** When any four (4) of the seven (7) Atlantic City Formula Trades obtain a six (6) hour day, the Union shall work a six (6) hour day, the working day to be between the hours of 6 A.M. and 5 P.M. When sufficient Mechanics, Helpers and Apprentices are not available, an eight (8) hour day shall be worked. Whenever a local union obtains a six (6) hour day under this paragraph, the local union and the Company shall bargain as to the hours and overtime rates to be applied on the six (6) hour day.

**Par. 5.**

(a) When a majority of the Atlantic City Formula Trades (this means there must be four (4) of the seven (7) union Atlantic City trades), on a job work a shift or shifts following the day shift, the Company may work the following shifts. However, trades who perform the work as per their regular overtime rates shall not be considered as shift work.

(b) It is agreed that the "Day Shift" shall consist of eight (8) hours between 8 A.M. and 4:30 P.M., five (5) days per week, Monday through Friday, inclusive.

(c) The shift following the "Day Shift" shall work 7 1/2 hours between the hours of 4:30 P.M. and 12:30 A.M. and shall receive eight (8) hours pay plus an additional 10% per hour. The shift preceding the "Day Shift" shall work seven (7) hours between the hours of 12:30 A.M. and 8 A.M. and receive eight (8) hours pay plus an additional 15% per hour.

Any and all work during hours other than the established hours for any one of the three shifts shall be paid at double the hourly wage rate including any premium rate of the assigned shift.

(1) When an employee is called in prior to the regular starting time for his shift or he works beyond the regular quitting time of his shift, he shall receive double the hourly wage rate of his assigned shift for all hours in excess of the established hours for his shift.

(2) When an employee is required to work hours that are not continuous with the established hours for his assigned shift he shall be paid for such hours at double the hourly wage rate of his assigned shift or double the hourly wage rate of the shift on which such excess hours are performed whichever rate is higher.

(3) When the Company assigns an employee to a shift the employee shall work that shift a minimum of five (5) consecutive days. However, should the Company reassign an employee to another shift prior to working five (5) consecutive days, or within twenty-four (24) hours of completing a shift, the employee shall receive the applicable overtime rate of the new shift he is assigned to for the first day only or the applicable overtime rate of the shift to which he had previously been assigned, whichever is higher, thereafter the employee shall receive the applicable rates for the new shift to which he is assigned. An employee who requests a shift reassignment and is reassigned as outlined herein, shall



receive the applicable rates for the new shift to which he is assigned at single time only.

(4) When an employee has performed work on another job and he is directed to work on a shift job within twenty-four (24) hours after completing work on the other job, he shall receive the applicable overtime rate of his prior job or the applicable overtime rate of the shift to which he is assigned whichever rate is higher.

(d) Any work performed on Saturday, Sunday, Holiday shall be paid at double the hourly wage rate of the applicable shift including any premium rate.

(e) In the case of the second and third shifts and for the purpose of fringe benefit computations, each employee who works a full shift shall be considered to have worked eight (8) hours.

(f) The working hours set forth in Par. 3 and Par. 4 above may be changed by mutual agreement as provided in Article XXVI.

## ARTICLE VIII

### Repair Work

**Par. 1.** Repair Work is hereby defined as general repairs on apparatus enumerated in Article IV and Article IV (A) of this Agreement. Repair work shall be exclusively performed by Mechanics, Helpers and Apprentices.

**Par. 2.** General repairs are hereby defined as follows:

**Team repairs:**

Renewal of all ropes.

Renewal of brake linings (except small machines).

Shortening of all hoisting and counterweight cables.

Replacement of any traveling cable exceeding 50 feet in length.

Safety test where test weights are required.

Replacement of crosshead, counterweight or deflector sheave bearings.

Rescoring of sheaves or drums.

Replacement of worm and gears.

Rebabbitting of bearings.

Hydraulic repair work except cleaning, oiling, greasing, belts, small valves, adjusting and one man pressure relief valve test performed in accordance with Appendix A, item 22.

Adjusting or readjusting using test weights.

Realigning guide rails.

Replacing crossheads, stiles, safeties or equalizers.

Hoistway door closers with hydraulic or pnuematic-checks.

All escalator and moving walk repair work must be done by a team. (Exception Article IX, Contract Service Work, callbacks and examination may be done by one person if there is no factor of safety).
Exception to above: Residence elevator as described in A.S.M.E. A17.1 code which shall be one person.



**One man repairs:**

Installing sound isolation.

Replacement of door hangers (except for freight bi-parting doors).

All door closer work (except for freight bi-parting doors).

Rewiring car switches, governors and selectors or any other apparatus in the car.

Refastening guide rails.

Replacing or repairing car floor covering.

Rewiring or reinstalling limit switches.

Replacing automatic rail or track oilers.

**One or Two Man Repairs:**

Armature repairs.

Renewing of car shoes or roller guides.

Repairs to cab or car gate.

Renewal of motor bearings.

Replacing thrust bearings.

Rewiring controllers.

Installation and/or replacement of the following (except when the completion of such work requires more than eight (8) hours, excluding travel time, it shall be performed by a team):

Proximity devices(door protection only).

Emergency lighting (battery chargers and lights).

Braille Plates.

Telephones/Communication Devices (with existing wiring and box in place.

Fixture Cover Plates (no wiring).

Key switches/Security devices (with existing wiring, excluding full Fireman's Service Operation).

Controller Wiring Changes (minor changes).

Fixture Replacement (in existing locations only).

Replacement of relays, timers, or mechanical devices with solid-state devices and circuitry.

The replacement of equipment on existing elevator installations.

Other repair work assignments not listed above may be one man assignments providing there is no factor of safety involved.

**Par. 3.** When escalators are prepared and/or disassembled for cleaning, oiling, greasing, adjusting and minor replacement, (minor replacement meaning work requiring one (1) hour or less), the work shall not be classed as repair work.

When escalators are prepared and/or disassembled for cleaning, etc., purposes as mentioned above, and any replacement and/or repairs requiring more than one (1) hour, only the replacement and/or repairs shall be classed as repair work.

When escalators are prepared and/or disassembled primarily for replacement and/or repairs, all work shall be classed as repair work.

**Par. 4.** When men who are employed on contract service work perform any of the repair work listed above during hours other than between 6 A.M. and 6 P.M., Monday to



Friday, inclusive, it shall be paid for at double the rate of single time. (Exception: employees performing one man repair while on call-backs shall be paid at 1.7 times the single time rate).

**Par. 5.** It is agreed the regular working day shall consist of eight (8) hours worked consecutively with an unpaid lunch period, between 6 A.M. and 6 P.M., five (5) days per week, Monday to Friday, inclusive. All other working time shall be classed as overtime and paid for at double the rate of single time.

## ARTICLE VIII (A)

### Modernization Work

**Par. 1.** Modernization work is hereby defined as any and all work performed on apparatus enumerated in Article IV and Article IV (A) in any existing or occupied building, to bring equipment up to date, including general repairs which are a part of a modernization job. However, a job which the machine is changed out or rails are removed, or new rails are installed shall be construction work. An escalator modernization shall be defined as the replacement of any or all components except the truss including general repairs which may be a part of a modernization job. Any other general repairs and contract service work shall be excluded from this Article. Modernization work shall be exclusively performed by Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices.

**Par. 2.** It is agreed the regular working day shall consist of eight (8) hours worked consecutively with an unpaid lunch period, between 6 A.M. and 6 P.M., five (5) days per week, Monday to Friday, inclusive. All other working time shall be

classed as overtime and paid for at double the rate of single time.

**Par. 3.** Upon notification to the Local Business Representative or to the Regional Director, if the modernization job is outside the jurisdiction of a local union, the Company may establish shift work. Shift work shall not be permitted except in cases where at least two (2) shifts per day are established for at least five (5) or more consecutive days including Saturday, Sunday, or Holiday when worked. One of the shifts must be the "Day Shift" as defined in Par. 4 below. When special circumstances exist, such as production or operation needs of the customer, a second and third shift **will** be worked without any day shift when the Company and the Local Business Representative or Regional Director, if the modernization job is outside the jurisdiction of the local union, have mutually agreed that one of the two (2) shifts does not have to be the "Day Shift."

**Par. 4.** It is agreed that the "Day Shift" shall consist of eight (8) hours between 8 A.M. and 4:30 P.M., five (5) days per week, Monday through Friday, inclusive.

**Par. 5.** The shift following the "Day Shift" shall work 7 1/2 hours between the hours of 4:30 P.M. and 12:30 A.M. and shall receive eight (8) hours pay plus an additional 10% per hour. The shift preceding the "Day Shift" shall work seven (7) hours between the hours 12:30 A.M. and 8 A.M. and shall receive eight (8) hours pay plus an additional 15% per hour.

**Par. 6.** Any and all work during hours other than the established hours for any one of the three shifts shall be paid at double the hourly wage rate including any premium rate of the assigned shift.

(a) When an employee is called in prior to the regular starting time for his shift or he works beyond the regular



quitting time of his shift, he shall receive double the hourly wage rate of his assigned shift for all hours in excess of the established hours for his shift.

(b) When an employee is required to work hours that are not continuous with the established hours for his assigned shift he shall be paid for such hours at double the hourly wage rate of his assigned shift or double the hourly wage rate of the shift on which such excess hours are performed whichever rate is higher.

(c) When the Company assigns an employee to a shift the employee shall work that shift a minimum of five (5) consecutive days. However, should the Company reassign an employee to another shift prior to working five (5) consecutive days, or within twenty-four (24) hours of completing a shift, the employee shall receive the applicable overtime rate of the new shift he is assigned to for the first day only or the applicable overtime rate of the shift to which he had previously been assigned, whichever is higher, thereafter the employee shall receive the applicable rates for the new shift to which he is assigned. An employee who requests a shift reassignment and is reassigned as outlined herein, shall receive the applicable rates for the new shift to which he is assigned at single time only.

(d) When an employee has performed work on another job and he is directed to work on a shift job within twenty-four (24) hours after completing work on the other job, he shall receive the applicable overtime rate of his prior job or the applicable overtime rate of the shift to which he is assigned whichever rate is higher.

**Par. 7.** Any work performed on Saturday, Sunday, or Holiday shall be paid at double the hourly wage rate of the applicable shift including any premium rate.

**Par. 8.** In the case of the second and third shifts and for the purpose of fringe benefit computations, each employee who works a full shift shall be considered to have worked eight (8) hours.

**Par. 9.** The working hours set forth in Par. 4 and Par. 5 above may be changed by mutual agreement as provided in Article XXVI.

## ARTICLE IX

### Contract Service

**Par. 1.** Contract Service is hereby defined as any contract obtained by the Company for regular examination or care of apparatus enumerated in Article IV and Article IV (A) of this Agreement and general repairs as indicated in Article VIII, Par. 2 for a period of not less than one (1) month. Contract Service Work shall be exclusively performed by Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices.

**Par. 2.** Two (2) helpers or apprentices to each three (3) mechanics may be employed in contract service work. The helper or apprentice when working with the mechanic shall perform all work assigned to him by the mechanic.

A 70% helper or a second year apprentice may work alone under the general supervision of the mechanic in his assigned district provided such helper or apprentice is met on the first job daily. The helper or apprentice shall notify the office and/or mechanic when changing jobs and at the completion of the workday.

When working alone the helper or second year apprentice shall perform only oiling, cleaning, greasing, painting, replacing of combplate teeth, relamping and fixture maintenance, the inspection, cleaning and lubrication of hoistway doors, car tops, bottoms, and pits, observing operation of equipment and at no time when working alone shall such a helper or apprentice perform any other work or function normally performed by mechanics. The word "District" means the regular contract service route of the mechanic or mechanics to whom the helper or apprentice has been assigned that day.



**Par. 2A.** When the Company obtains a contract that requires a Mechanic and Helper or Apprentice to be on the job and/or in a building at all times during the regular weekly working hours, such Helper or Apprentice shall not be considered as part of the two (2) to three (3) agreement mentioned above, provided no Probationary Helpers or Probationary Apprentices are assigned to such regularly scheduled work.

**Par. 2B.** Where a Local Office has contract service work requiring more than two (2) Elevator Constructor Mechanics full time, the third Elevator Constructor employed in that office may be a Helper or Apprentice. A 70% helper or second year apprentice may work alone under the general supervision of the mechanic in his assigned district provided such helper or apprentice is met on the first job daily. The helper or apprentice shall notify the mechanic when changing jobs and at the completion of the workday. When working alone such helper or second year apprentice shall perform only cleaning, oiling, greasing, painting, replacing of combplate teeth, relamping and fixture maintenance, the inspection, cleaning and lubrication of hoistway doors, car tops, bottoms, and pits, observing operation of equipment and at no time when working alone shall such a helper or apprentice perform any other work or functions normally performed by mechanics. The word "District" means the regular contract service route of the mechanic or mechanics to whom the helper or apprentice has been assigned that day.

The phrase "Local Office" as mentioned in this paragraph means Local Representatives, Resident Mechanics, etc. performing contract service work as defined in Par. 1 of this Article, in a city outside the primary of a local union. (Local Representatives, Resident Mechanics, etc., as referred to above, shall be permitted to do one man or as a member of a team, team repairs, in accordance with Article VIII, Par. 2), and, as a member of a team, ADA modernization and unloading of construction material. However, where a local office is located within a zoned or per diem area of a local union, the employee(s) assigned to such office shall be paid expenses in accordance with the Local Travel and Expense Agreement when performing work, as a member of a team, team repairs, ADA modernization and unloading of construction materials.

Inasmuch as Local Representatives, are on call for extended periods of time, they shall, upon request, receive a minimum of six (6) weekends per year when they are relieved of their on-call obligation. These weekends are in addition to their accrued vacation. The Local Representative must give fourteen (14) calendar days notice before each requested weekend off.

**Par. 2C.** Upon reasonable request of the International Office of the IUEC, the Company shall make available to the properly designated International Representative the information necessary to determine that all employees in a service office are being treated relative to wages, hours worked, straight time and overtime hours paid, Pension and Health Benefit Plan payments in accordance with the Otis Agreement.

**Par. 3.** It is agreed the regular working day shall consist of eight (8) consecutive work hours, with an unpaid lunch period, between 6 A.M. and 6 P.M., five (5) days per week, Monday to Friday, inclusive. Any Mechanic, Helper or Apprentice



assigned regular hours beginning before 8 A.M. or ending after 5 P.M. shall be so assigned for a five (5) consecutive working day increment. It is agreed that for business reasons of the Company or personal reasons of the affected employee, the Company and the local union may modify these times.

It is agreed that in order for call-backs to be answered in downtown business areas or similar business areas, the Company may assign a Mechanic or Mechanics to remain at a mutually agreed building beyond regularly established working hours not to extend beyond 6:30 P.M. For all such work beyond his regularly established working hours the Mechanic or Mechanics shall be paid at the rate of time and one-half. Should such assigned Mechanic or Mechanics be authorized to continue work on a job when a call-back extends beyond 6:30 P.M., the man or men shall receive applicable travel time and travel expense home. Where a paid or non-paid holiday occurs, Monday through Friday, inclusive, the work performed on Saturday during the week in which any holiday occurs shall be time and one-half the single time rates.

**Par. 4.** Work performed on Sundays shall be classed as overtime and paid for at the rate of double time (2x). All other time worked before and after the regular working day or in excess of eight (8) consecutive work hours with an unpaid lunch period and on Saturdays shall be at the rate of time and one-half.

**Par. 5.** Call-backs on contract service on overtime, except Sundays and holidays, shall be paid for at the rate of 1.7 times the rate of single time.

**Par. 6.** Call-backs on contract service on Sundays and holidays shall be paid for at double the rate of single time.

**Par. 7.** On contract service where the Company has a contract in one building only or adjacent buildings, for the examination and care of enough elevators to warrant keeping a man or men working continuously for sixteen (16) hours, the company may establish a shift (s) from 5:00 pm to 12:00 am or 12:00 am to 7:00 am. Pay for this work will be (8) hour's pay for (7) hours worked at the regular rate of pay. Saturday, Sunday, and Holidays are classed as overtime and paid at the overtime rate. For the sixteen (16) hour calculation the seven (7) hour shift will be counted as an eight (8) hour shift.

**Par. 8.**

(a) Employees engaged in contract service work agree they will respond to call-backs outside of their regular work hours. The Company, the local union, and the employees shall meet and cooperate in establishing a callback system, which will cover such issues as a list of employees available on designated dates to respond to overtime callbacks, the number of employees on call-back at any given time, replacements for vacations and holidays, and trading of on-call duty. In the event the local union, the employees, and the Company cannot agree on the establishment of the callback system, the Company and the IUEC will meet to establish the system.

Travel time from home to job and from job to home on overtime call-backs (starting after regular working hours and terminating before start of regular working hours) shall be paid for at the same overtime rate applying to the work. Travel expenses on overtime call-backs shall be paid as agreed in Local Expense Agreements.

When consecutive overtime call-backs occur, the employee shall receive the applicable overtime rate and travel expenses from home to job, from that job to one or more other jobs and then back home.



Men called out before the regular working hours shall receive the applicable travel time and travel expense from home to job. (Exception: The Company may call and instruct men to report to any given job at his regular starting time on his route in the primary.)

When call-backs made during regular working hours extend into overtime and the employee is authorized to continue work, he shall receive the applicable travel time and travel expense home.

(b) Employees who are designated to be available for overtime call-backs pursuant to paragraph (a) above, or who are called out before the regular working hours, or who are on call-backs that extend into overtime, shall be entitled to and receive such compensation as described below during the period of time that such employees are responding to call-backs outside of their regular hours of work:

The rate of pay for overtime call-backs shall not be less than 1.7 times the straight time rate of pay.

The premium pay described above is made in lieu of standby pay and in recognition of the fact that contract service employees agree to make themselves available for overtime calls.

(c) It is understood and agreed that employees who are available to respond to overtime call-backs are waiting to be engaged (as defined by the Fair Labor Standards Act) by the Company. Employees who are waiting to be engaged are free to participate in personal activities; are not required to remain at home, at the Company's premises or any other specified location during the period that they are on call. Employees who are "on call" may leave the location they have indicated as the place of their primary contact. However, such employees will be available for callout by either leaving another phone number where they can be contacted or by carrying on their person a communication device such as a pager, cellular telephone, two-way radio, or other such communication device which enables the Company to contact them.

# ARTICLE X

## Designation of Helper's and Apprentice's Work and Qualifications

**Par. 1.** It is agreed by the Union that there shall be no restrictions placed on the character of work which a Helper or Apprentice may perform under the direction of a Mechanic. A Helper or Apprentice certified to weld shall be paid mechanic's rate when performing welding, (excluding tack welding). However, Helpers and Apprentices on contract service work are subject to the provisions of Article IX.

**Par. 2.** The total number of Helpers and Apprentices employed shall not exceed the number of Mechanics on any one job, except on jobs where two teams or more are working, one extra Helper or Apprentice may be employed for the first two teams and an extra Helper or Apprentice for each additional three teams.

Further, the Company may use as many Helpers and Apprentices as best suits his convenience under the direction of a Mechanic in wrecking old plants and in handling and hoisting material, and on foundation work. When removing old and installing new cables on existing elevator installations, the Company may use two Helpers or Apprentices to one Mechanic.

**Par. 3.** A newly-hired employee without previous mechanical experience shall be classified as an Apprentice and shall work as a probationary employee in the status of an Apprentice for a period or periods totaling six (6) months within the aggregate period of not more than nine (9) months. The Company and the Union shall have the privilege of testing the ability of probationary employees during this six (6) month period. If they agree that the Apprentice



during this probationary period does not display sufficient aptitude to become a first year Apprentice he shall be discharged.

Probationary Apprentices shall advance from the fifty (50) percent wage rate to the first year apprentice's wage rate upon completion of six (6) months in the elevator industry provided such Probationary Apprentices have worked a minimum of one hundred (100) hours in each thirty (30) day period during the six (6) months. The first year apprentice wage rate shall be effective at the beginning of the next weekly pay period following completion of the six (6) months.

It is understood that probationary employees during the probationary period above set out may be discharged or laid off at any time with or without cause and no reason need be assigned therefore, and no such discharge shall be construed as a grievance. The probationary period may be worked with more than one employer provided such employer has a labor contract with the IUEC, and the period of six (6) months probation may cover an aggregate period of not more than nine (9) months. A month shall be deemed worked when the probationary employee completes one hundred (100) hours in any thirty (30) day period.

**Par. 4.** An Apprentice may work as a Temporary Mechanic provided he/she has completed a minimum of his/her first year apprenticeship requirements, and other requirements for Temporary Mechanics prescribed from time to time by NEIEP, and upon agreement of the Employer and the Union Representative, or Regional Director if he/she works outside the jurisdiction of the Local Union, and at the same scale as a regular Mechanic. Those selected first will be Apprentices who have completed all of their apprenticeship training and are waiting to take the Mechanics Exam. Those selected second will be workmen who have completed all of their training and failed the mechanic's exam and are actively participating in the educational program, they must maintain atten-

dance and passing requirements mandated by NEIEP. Those selected third will be fourth year Apprentices and those selected fourth will be third year Apprentices, followed by finally second year apprentices. Employers may select Apprentices and Helpers in its employ to work as Temporary Mechanics under the provisions of this paragraph if there are no qualified Mechanics available in that Local.

Apprentices serving as Temporary Mechanics will be put back to Apprentice Status when their temporary assignment is completed or within fifteen (15) working days of when the Employer is notified there is a qualified Mechanic available whichever comes first. The order for putting back Temporary Mechanics to Apprentice Status will be in reverse order; 1) second year apprentices, 2) third year Apprentices, 3) fourth year Apprentices and 4) workmen who have completed all their training and failed the Mechanics Examination and are actively participating in the educational program and finally Apprentices who have completed all of their apprenticeship training and are waiting to take the Mechanics Exam.

In order to administer this procedure, NEIEP will provide to the Company on a semi-annual basis a listing of all the Employer's eligible apprentices and helpers and the modules they have completed.

It is agreed that the withdrawal of or failure to issue a Temporary Mechanic's card will not be used by the Union to advance its position with respect to a dispute unrelated to this paragraph of Article X.

No Apprentice may qualify or be raised to the capacity of Mechanic until he has worked for a period of three (3) years in the elevator industry, has successfully completed the required NEIEP courses, and has passed a Mechanic's Examination administered by the NEIEP Director's Office. Such examination shall only be administered no more or no



less than once every twelve months in each local. The National Elevator Industry Education Program has developed and will periodically update a standardized Mechanic's Examination which will be used in each local. An Apprentice who has successfully passed a Mechanic's Examination shall become a Mechanic no later than sixty (60) days after the date of the examination. Should he fail to qualify, he cannot again take the Mechanic's Examination for a period of one (1) year.

**Par. 5.** Employees who enter the Military Service shall, upon re-employment, be accorded all rights provided by law.

## ARTICLE XI

### System of Payment

**Par. 1.** It is agreed that all Mechanics, Helpers and Apprentices shall be paid weekly by check, which shall be sent to any address they elect to designate other than the Company's address. Mechanics, Helpers and Apprentices shall be given the option to be paid by direct deposit or by direct mail. However, there shall be no obligation on the part of any employee or the Company to participate in the direct deposit/direct mail program and no discrimination against either one if either should elect not to participate. Once enrolled, an employee in direct deposit/direct mail program may elect to discontinue enrollment by giving the Company ten (10) working days written notice. Should a change to a time ticket be required, the Company shall notify the mechanic and/or helper or apprentice in writing of the reason for such change within five (5) working days.

Mechanics, Helpers and Apprentices shall be paid by voucher on the next regular work day following the employee's regular pay day if the employee does not receive his regular pay check.

It is further agreed that in those instances where the Company is consistently unable to comply with the provisions of this paragraph, the Company shall pay each employee on the job or at the office on company time by cash or by check.

**Par. 2.** Elevator Constructors shall receive at the time of weekly payment, a check stub containing the following information:

1. Employee's name and social security number.
2. Total hours worked - regular and overtime, accumulative.
3. Total wages - weekly and accumulative.
4. Federal income taxes withheld.
5. FICA taxes withheld.
6. Health Benefit Plan & Pension deductions weekly and accumulative.
7. Any other authorized or legitimate deductions.
8. Vacation pay - weekly and accumulative in amount of money.

At the time of weekly payment, at the employee's request, the Employer shall also provide the employee with a document, in writing, reporting the time the employee submitted to his Employer for that payment, regardless of whether the employee submitted his time on paper, electronically, or by any other medium.

Should the Company's payroll and/or accounting department experience a short work week due to a holiday or any other reason, the Company shall make any special arrangements necessary to insure employees receiving pay on schedule.



## ARTICLE XII

### Vacations

**Par. 1.** The following plan is established for Vacation Pay: (a) A man who has worked less than five (5) years in the business shall receive Vacation Pay credit on the basis of 6% of his regular hourly rate for all hours actually worked. A man who has worked more than five (5) years in the business shall receive Vacation Pay credit on the basis of 8% of his regular hourly rate for all hours actually worked.

No Vacation Pay shall accrue for the first six (6) months worked in the business.

(b) The vacation pay accrued from January 1 of one year through June 30 of the same year shall be paid in full to the employee by July 15 of that year. The vacation pay accrued from July 1 of one year through December 31 of the same year shall be paid in full to the employee by January 15 of the succeeding year.

(c) A man with less than five (5) years in the business who works 1750 hours or more but less than 2000 hours in any vacation year shall receive at least 120 hours vacation pay. A man with more than five (5) years in the business who works 1750 hours or more but less than 2000 hours in any vacation year shall receive at least 160 hours vacation pay. The vacation year shall run from January 1 through December 31.

(d) Where vacation pay equal to ten (10) or more days has been accumulated for an employee with less than five (5) years of service, and fifteen (15) or more days for an employee with more than five (5) years of service such employees must take a minimum vacation of ten (10) and fifteen (15) days, respectively.

(e) The employee shall have the option of taking any additional vacation accrued in excess of the amount stated under Paragraph (d) above provided he has obtained prior approval from the Company.

(f) It is understood and agreed that work conditions must be taken into consideration when vacations are arranged.

Time off for vacation shall be taken as a full complete period whenever possible.

(g) Vacation Pay accrued will change from 6% to 8% on the first payroll period after the first month following completion of five (5) years in the business. These five (5) years include the six (6) months probationary period.

(h) The local union shall furnish the Company, on request, dates that Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices were first employed in the elevator industry.

(i) When a man leaves the Company the Vacation Pay shall be retained. He shall receive the retained amount due him at the time specified in (b) above.

(j) When a man retires from the industry, the Company shall pay any vacation pay he is owed within thirty (30) days after his retirement provided he notifies the Company in advance and in writing.

(k) Where vacations interfere by temporarily breaking up a team the Company shall have the right to place the extra man to the Company's advantage. Serious interference shall be taken up with the Business Representative.

(l) Time spent outside the industry, whether or not a member of the local union. shall not count toward vacation eligibility status. An employee with at least one (1) year's service in the industry who takes time off for service in the Armed Services shall have such service time counted toward his vacation eligibility status upon return to the industry.

(m) Hours worked for the Company by a member of a local union, while outside of the jurisdiction of that local, shall count for vacation pay.

(n) Hours paid as holiday pay, vacation pay, or traveling time outside of the regular working hours are not to be counted as hours worked when computing vacation pay (Exception: traveling time on overtime callbacks, whether



emergency maintenance or emergency repair work, shall be counted as hours worked when computing vacation pay).

(o) At the time vacation pay is paid Federal and State taxes shall be withheld on the basis of the number of weeks of vacation or portion of a week of vacation the accrued vacation pay represents. The intent of this provision is that taxes will be withheld at weekly rates rather than the higher rates for a lump sum payment of vacation pay.

## ARTICLE XIII

### Traveling Time and Expenses

**Par. 1.** When Elevator Constructors are sent outside the primary jurisdiction, but within the zoned area of the secondary, travel time and travel expense shall be paid in accordance with the Local Expense Agreement.

When Elevator Constructors are sent beyond the zoned area of the secondary jurisdiction or outside the secondary jurisdiction all travel time during the regular established work hours, Monday through Friday, inclusive, shall be paid at single time rates. Likewise, all travel time before and after the regular established work hours, Monday through Friday, inclusive, shall be paid at time and one-half rates. Further, all travel time on Saturdays, Sundays and Holidays shall be paid at time and one-half rates (as agreed to in Article IX, Contract Service, travel time on overtime call-backs is excepted from the above). Expenses incurred on trip to be paid by the Company in accordance with the Local Expense Agreement.

Employees operating vehicles provided by the Company shall not be entitled to payment of wages or commuting expenses for time spent driving before or after the regular working hours from the employee's home to the first job site of the regular work day or driving from the last job site of

the regular work day to the employee's home. (Note: Employees shall be reimbursed for any tolls in excess of the toll charge for passenger vehicles). This is not intended to circumvent expenses or travel time paid pursuant to Art. IX or Art. XIII and/or a Local Travel and Expense Agreement or established local practice.

**Par. 2.** Local unions and the Company are requested to establish zones within the secondary jurisdiction and traveling time and traveling expense allowances for each zone, consistent with existing arrangements.

**Par. 3.** When the Local Union and Otis Representative are unable to resolve differences regarding local travel time and travel expense agreements and presently recognized primary and secondary jurisdiction, either party may request the General President, IUEC and the Director; Industrial Relations to study the dispute. The General President, IUEC and the Director, Industrial Relations, or their designees, shall entertain the request, and after investigation and study, are authorized to make recommendations to the Local Union and the Otis Representative.

The General President, IUEC and the Director, Industrial Relations, or their designees, may issue guidelines that the Local Union and the Otis Representative may utilize in negotiating changes to and resolving disputes over local travel time and travel expense agreements.

All parties shall continue to work under the existing local travel time and local travel expense agreement for thirty (30) days from the date that Otis and the IUEC are notified that the parties have reached an impasse. The General President, IUEC and the Director, Industrial Relations, or their designees, may at their discretion extend the present Agreement for one additional thirty (30) day period.



## ARTICLE XIV

### Strikes and Lockouts

**Par. 1.** It is agreed by both parties to this Agreement that so long as the provisions herein contained are conformed to, no strikes or lockouts shall be ordered against either party. It is understood that this Paragraph shall be applied and construed consistent with the provisions of Article IV, Par. 11 concerning Grievance and Arbitration procedure.

**Par. 2.** No strike will be called against the Company by the Union unless the strike is approved by the International Office of the International Union of Elevator Constructors. Sufficient notice shall be given to the Company before a strike shall become effective. Except in the case of Contract Service Work as specified in Article IX of this Agreement, work stoppages brought about by lawful picketing or strikes by building trades local unions affiliated with Building Trades Councils shall not constitute a strike within the meaning of this Article.

**Par. 3.** In the event of a strike, work stoppage or lockout affecting Mechanics, Helpers and Apprentices on New Construction or Repair Work, men working on Contract Service shall not be affected by such strike, work stoppage or lockout, and the Union will supply competent men to the Company to do all work covered under Contract service whether such men are continuously employed in this work or not prior to the strike, work stoppage or lockout.

## ARTICLE XV

### Arbitration

**Par. 1.** Any difference or dispute regarding the application and construction of this Agreement, shall be referred to as a "grievance" and shall be resolved under the following procedure. Both parties commit to making an earnest effort to resolve differences in accordance with the procedure outlined below:

**Par. 2.** Oral Step. Any employee, local union, or the Employer with a grievance (hereinafter called the "grievant"), shall discuss the grievance with the designated Employer Representative (or Local Union Business Representative) within ten (10) working days after the cause of the grievance is known or should reasonably have been known. The Employer shall designate to each local union the Employer's Representative(s) for the purpose of responding to grievances at this step. If the grievance is initiated by an employee, the Local Business Representative shall be present during the discussion.

Within three (3) working days after the above discussion, the Employer's Representative shall notify the employee and the Local Union Business Representative of his disposition of the matter.

The Local Business Representative shall similarly respond to the Employer's grievance.

**Par. 3.** Written Step One. If the issue remains unresolved after the conclusion of the Oral Step, the grievant, within ten (10) working days of the conclusion of the Oral Step, may submit in writing on provided forms a brief statement of the grievance, including the Article and paragraph of the Agreement allegedly violated (if known), and the remedy requested.



Within fifteen (15) working days after the written grievance is received by the Employer (or the Union), a meeting will be held to discuss the grievance. The Employer shall be represented by the Regional Field Manager, Field Employee Relations or his designee and the designated Employer Representative described in Paragraph 2. The union shall be represented by the IUEC Regional Director or other Representative designated by the General President and the Local Business Representative described in Paragraph 2.

At the meeting (or any continuation thereof agreed to by the parties) the Employer (or the Union) shall give its written answer to the grievance on the provided form. Within ten (10) working days of that disposition, the Employer or the Union shall indicate on the grievance form whether it appeals therefrom. If the grievance disposition is not appealed, it shall be final and binding on all parties.

**Par. 4** Written Step Two. If the grievance is appealed it shall be placed on the agenda of a scheduled meeting of the National Arbitration Committee. The Employer shall be represented by the Director, Labor Relations or his designee and a panel of two (2) additional Employer Representatives. The Union shall be represented by the General President or his designee and two (2) additional representatives.

The National Arbitration Committee shall meet once per calendar quarter. Each party shall submit an agenda not less than seven (7) working days prior to the meeting.

The Director Labor Relations or his designee (or the General President, IUEC or his designee) shall render a disposition of the grievance in writing at the National Arbitration Committee Meeting. If the grievance disposition is accepted, it shall be final and binding on all parties.

**Par. 5.** Impartial Arbitration. If the grievance is not settled by the National Arbitration Committee, the Union or the Employer, within fifteen (15) working days of the

Employer's (or Union's) disposition as outlined in Paragraph 4, may appeal the grievance to impartial arbitration. Such appeal shall take the form of a letter to the Director of Labor Relations (or the General President, IUEC).

**Par. 6.** The parties shall mutually agree upon the selection of an impartial arbitrator. If, within fifteen (15) days, the parties are unable to agree on the person to be selected as arbitrator, the parties shall jointly request to submit the matter to arbitration conducted in accordance with the Labor Arbitration Rules and Procedures of the American Arbitration Association and by an arbitrator who is a member of the National Academy of Arbitrators.

The arbitrator shall render his decision immediately upon the close of the record if the parties mutually agree otherwise the decision shall be rendered within thirty (30) days of the close of the record or the receipt of the briefs if the parties desire to file briefs. In an arbitration, either party may rely upon Articles in the Agreement other than those set forth in the original grievance form. The decision of the impartial arbitrator shall be final and binding on all parties.

**Par. 7.** It is understood that the arbitrator does not have the authority to add to, subtract from or modify in any way the provisions of this Agreement.

**Par. 8.** Grievances of the Union or the Employer shall originate at Written Step Two by submission to the Director of Labor Relations (or the General President, IUEC). The grievance of an IUEC Regional Director shall be filed and processed beginning at Written Step One of the procedure.

**Par. 9.** Discharge Grievances Expedited Impartial Arbitration. Recognizing the special nature of cases involving the discharge



of an employee, the parties agree that such case(s) shall be handled as follows:

(a) Any discharge grievance not resolved at the Written Step One meeting may immediately be referred by either party to the Director of Labor Relations or his designee and the General President, Union or his designee for their immediate review and discussion. Such grievance need not wait to be placed on the agenda of the scheduled National Arbitration Committee, but rather shall be discussed, either in person or by telephone, by the parties within ten (10) working days of the referral from Written Step One. The parties shall make an earnest effort to resolve their differences at this meeting, but failing such agreement, either party may request immediate, expedited impartial arbitration.

(b) Within ten (10) working days of a request for impartial arbitration by either party, the parties shall mutually agree upon the selection of an impartial arbitrator who shall be obliged to schedule a hearing at the earliest possible available date on his/her schedule where both parties are available to present their respective cases. The arbitrator shall hear the case. Post-hearing briefs must be submitted within two (2) weeks of the conclusion of the hearing. The arbitrator shall render the award within two (2) weeks of the submission of briefs. Post hearing briefs may be waived by mutual agreement of the parties.

**Par. 10.** Compensation and expenses of the arbitrator shall be shared equally between the Employer and the Union.

**Par. 11.** Any of the time limits contained herein may be mutually extended by the representatives of the parties. Failure to appeal the grievance within the time limits described above without mutual agreement shall be considered an abandonment of the grievance. If a grievance is not dispositioned within the above time limits, it shall be immediately processed to the next step of the procedure.

## ARTICLE XVI

### Jurisdictional Territory

**Par. 1.** The primary jurisdiction of any local union shall include only that territory in which its members will agree to travel on their own time.

The secondary jurisdiction shall include the balance of the territory now within the jurisdiction of the local union.

**Par. 2.** Any change to the present jurisdiction of a local must be approved by the International Union of Elevator Constructors and the Director, Industrial Relations before becoming effective.

**Par. 3.** The primary jurisdiction of Local No. _____ of the City of _____, relative to the wage scale and working conditions shall include the following territory:
The secondary jurisdiction of Local No. _____ of the City of _____, relative to working conditions shall include the following territory:

**Par. 4.** The parties agree that they meet annually and by mutual agreement more often, if necessary to discuss jurisdictional issues. The parties agree to fairly act upon justifiable written requests by Local Unions for extensions of existing jurisdictions. The Company and the IUEC shall advise a Local Union within sixty (60) days after the meeting at which the request is considered, of its disposition of the request.

When opening a Local Office the following steps shall be followed:

1. Otis shall notify the Local Business Manager/Representative when opening a new "Local Office" in a Local Union's secondary jurisdiction or open territory.
2. Otis shall bargain with the Local Business Manager/Representative or International when considering



the assignment of a bargaining unit employee to a Local Office. No bargaining unit employee will negotiate directly with the Company.

3. Otis agrees to make forty (40) hours per week available to the first employee assigned to a Local Office. As each additional employee is assigned to such office thereafter, Otis agrees to make not less than thirty-two (32) hours of work available to the most recent addition and forty (40) hours per week available to all but the last employee so assigned.
4. Local Office employees will perform work per Article IX, Par. 1 and Article IX, Par. 2B.
5. Local Office employees shall not perform work in the primary of a local union unless mutually agreed to by Otis and the Local Business Manager/Representative.
6. Local Office Employees shall perform their work in accordance with the Otis National Agreement at all times.

## ARTICLE XVII

### Health Benefit Plan

**Par. 1.** The Health Benefit Plan covering life insurance, sickness and accident benefits, and hospitalization insurance, or any changes thereto that are in accordance with the National Elevator Industry Health Benefit Plan and Declaration of Trust, shall be a part of this Agreement and adopted by all parties signatory thereto.

**Par. 2.** The Health Benefit Plan shall be financed by mutual contribution, of Employers and Elevator Constructor Mechanics, Helpers and Apprentices as provided herein. The Employer agrees to continue to pay and contribute four dollars and seventy-seven and one half cents ($4.775) for each hour of work performed by all Elevator Constructor

Mechanics, Helpers and Apprentices in its employ. The four dollars and seventy-seven and one half cents ($4.775) hourly contribution rate shall increase upon every anniversary of the wage rate change of each Local Union, in accordance with the following (except as modified pursuant to Article V, Paragraph 3):

| **Effective Date** | **Amount of Increase** | **Hourly Contribution Rate** |
|---|---|---|
| 1st Anniversary Date | $1.00 | $5.775 |
| 2nd Anniversary Date | $0.50 | $6.275 |
| 3rd Anniversary Date | $0.50 | $6.775 |
| 4th Anniversary Date | $0.50 | $7.275 |
| 5th Anniversary Date | $0.50 | $7.775 |

Each Elevator Constructor Mechanic, Helper and Apprentice shall continue to contribute three and one-half cents (3-1/2c) per hour. Payments of said contributions by the Employer and Elevator Constructor Mechanics, Helpers and Apprentices shall be in accordance with the National Elevator Industry Health Benefit Plan and Declaration of Trust.

**Par. 3.** It is understood and agreed that the contributions provided for in Par. 2 shall be used by the Trustees to maintain the plan of benefits provided by the Health Benefit Plan to the extent that it is feasible to do so on a sound financial basis without any increase in said hourly contribution rates during the term of this Agreement (except as modified by Article V. Par. 3).

**Par. 4.** It is understood and agreed that the decision(s) to increase or decrease the benefits provided by the Health Benefit Plan are matters committed to the discretion of the Trustees, except that the Trustees should not make any



change in the plan of benefits which would result in the need for an increase in the contribution rates set forth in Par. 2. It is further understood and agreed, that the Actuary of the Health Benefit Plan shall continuously monitor the financial condition of the Health Benefit Plan and shall promptly advise the Trustees whenever in the opinion of the Actuary, it is necessary for the Trustees to modify benefits provided by the Health Benefit Plan in order to maintain the Health Benefit Plan in sound financial condition without any increase in the hourly contribution rates set forth in Par. 2. The Actuary shall report to the Trustees with respect to such matters at least once each year as soon as is feasible after the financial and actuarial information for the Health Benefit Plan as of the end of the plan year is available.

**Par. 5.** In no event shall a contribution rate of the Company exceed the lowest contribution rate paid by any other contributor to the Health Benefit Plan for the type of work covered by this Agreement.

## ARTICLE XVIII

### Pension Plan

**Par. 1.** The National Elevator Industry, Inc., and the International Union of Elevator Constructors shall continue the Pension Trust Fund known as the "National Elevator Industry Pension Plan," which is administered by a board of eight (8) Trustees, four (4) appointed by the National Elevator Industry, Inc., and four (4) appointed by the International Union of Elevator Constructors. The Board of Trustees have adopted a Declaration of Trust and Plan of Pension Benefits which shall be a part of this Agreement and binding on all parties signatory to this Agreement.

The normal retirement age of the Pension Plan is sixty-five (65) years of age.

**Par. 2.** The Plan of Pension Benefits shall be financed by contributions as provided herein. The Company agrees to continue to pay and contribute two dollars and fifty-one cents ($2.51) for each hour of work performed by all Elevator Constructor Mechanics, Helpers and Apprentices in its employ.

The two dollars and fifty-one cents ($2.51) hourly contribution shall increase upon every anniversary of the wage rate change of each Local Union, in accordance with the following (except as modified pursuant to **Article V, Paragraph 3**):

| Effective Date | Amount of Increase | Hourly Contribution Rate |
|---|---|---|
| 1st Anniversary Date | $0.37 | $2.88 |
| 2nd Anniversary Date | $0.27 | $3.15 |
| 3rd Anniversary, Date | $0.27 | $3.42 |
| 4th Anniversary Date | $0.27 | $3.69 |
| 5th Anniversary Date | $0.27 | $3.96 |

Payments of said contributions by the Company shall be in accordance with the terms of the Declaration of Trust adopted by the Board of Trustees. However, in no event shall contributions by the Company exceed the lowest contribution paid by any Employer contributor to the Pension Plan for the type of work covered by this Agreement performed in the same geographical jurisdiction of a given local.

**Par. 3.** It is understood and agreed that the increased contributions provided for in Par. 2 shall be used by the Trustees, taking into consideration the financial limitations of the Pension Plan, to significantly improve the Plan of Pension Benefits in accordance with the letter of Buck Consultants dated February 28, 2002 so that by, February 1, 2007 there



will be a gradual increase in the applicable benefit rate for normal retirement benefit from $90.00 to $110.00 per year of credited service, and that, effective July 1, 1997, there will be an improvement in the early retirement benefits, as set forth in said letter dated April 9, 1997. The implementation of the foregoing improvements shall be subject to the following paragraph:

The parties intend that the Pension Plan be funded in a manner designed to have no withdrawal liability and to fund the actuarial liabilities over a period of twenty-five (25) years. Therefore, in adopting benefit improvements to the Pension Plan, the Trustees are directed to consider (a) whether at that time there is withdrawal liability under Title IV of ERISA, (b) whether, in the opinion of the Plan's Actuary, the improvement is likely to create a withdrawal liability, and (c) the policy of amortizing unfunded actuarial liabilities over a period of twenty-five (25) years.

Each year, as soon as feasible after the financial and actuarial information for the Pension Plan as of the last day of the Plan Year is available, the Plan Actuary shall advise the Trustees with respect to the funding of the Pension Plan, taking into account the criteria set forth in Paragraph 3. It is understood and agreed that the improvements in the Plan of Pension Benefits which are referenced in the Buck Consultant's letter of February 28, 2002 should be approved by the Trustees only if the increase in the Plan of Pension Benefits shall not require any increase in the hourly contribution rates set forth in Par. 2 and the three criteria set forth in the immediately preceding paragraph have been met.

## Article XVIII (A)

### 401 (k) Annuity

The National Elevator Industry 401(k) Retirement Plan shall have a provision added to enable the Plan to accept annuity contributions and shall be known as the Elevator Constructors Annuity and 401(k) Plan.

The Plan shall be administered by a board of eight (8) trustees; four appointed by the International Union of Elevator Constructors and four appointed by the National Elevator Industry, Inc.

The Board of Trustees shall adopt a Declaration of Trust and Plan of Benefits which shall be part of this agreement and binding on all parties signatory to this agreement.

The annuity benefits shall be funded by Employer contributions as follows (except as modified pursuant to Article V, Paragraph 3):

| Effective Date | Amount of Increase | Hourly Contribution Rate |
|---|---|---|
| 1st Anniversary | $0.40 | $0.40 |
| 2nd Anniversary | $0.20 | $0.60 |
| 3rd Anniversary | $0.20 | $0.80 |
| 4th Anniversary | $0.20 | $1.00 |
| 5th Anniversary | $0.20 | $1.20 |



## ARTICLE XIX

### Educational Fund

**Par. 1.** The National Elevator Industry, Inc., and the International Union of Elevator Constructors have established an Education Trust Fund administered by a joint board of trustees. The Educational Trust Fund known as the "National Elevator Industry Education Program" shall provide an apprenticeship program for the education and training of apprentices as well as a continuing education program for elevator mechanics. Such Fund has been established pursuant to and in compliance with the provisions of Section 302 of the Labor-Management Relations Act, as amended.

**Par. 2.** The apprenticeship program called for herein shall be for a period of four (4) years and shall in all respects conform to the regulations of the United States Department of Labor and or applicable state apprenticeship councils governing registered apprenticeship programs. The pattern standards for the apprenticeship program are set forth in appendix [B] to this agreement and are incorporated herein. Through coordination with the Director of the National Elevator Industry Education Program, local committees consisting of representatives of employers signatory to this agreement and IUEC Local Unions, shall prepare and submit for approval to the applicable state apprenticeship councils such documents as may be necessary to secure registration of the apprenticeship program called for herein. Upon the approval of the parties hereto, such committees may alter the program of apprenticeship set for in appendix [B] hereto if in their opinion such alterations are called for by applicable state law.

**Par. 3.** The Board of Trustees of the Education Trust Fund shall have full authority and discretion to adopt Agreements and Declarations of Trust and educational and training programs which shall become a part of this Agreement and binding on all parties to the Agreement.

**Par. 4.** The National Elevator Industry Education Program shall be financed by contributions by Employers as provided. Upon the effective date of this Agreement the Company agrees to continue to pay and contribute to such Fund (.17¢) per hour for each hour of work performed by all Elevator Constructor Mechanics, Helpers and Apprentices. The seventeen (.17) cent hourly contribution shall increase annually. The thirteen (.13) cents employer contribution effective July 9, 2002 will not be deducted from the hourly wage and fringe package of the elevator constructor. The existing (.17) cent contribution plus the additional thirteen cents (.13) will become a base *[.30 cent] hourly* contribution, and shall increase annually. The amount of the Company contribution will be as follows (except as modified by Article V. Par. 3):

| Effective Date | Amount of Increase | Hourly Contribution Rate |
|---|---|---|
| July 9, 2002 | $0.13 | $0.30 |
| 2nd Anniversary Date | $0.04 | $0.34 |
| 3rd Anniversary Date | $0.03 | $0.37 |
| 4th Anniversary Date | $0.03 | $0.40 |
| 5th Anniversary Date | $0.03 | $0.43 |

Payment of said contributions shall be in accordance with the terms of the Declaration of Trust adopted by the Board of Trustees. However, in no event shall contributions by the Company exceed the lowest contribution paid by any Employer contributor to the Fund.



**Par. 5.** It is understood and agreed that if prior to any calendar year the Trustees shall advise the IUEC and Otis that the amount of the contributions set forth in Par. 4. above are providing more than sufficient funds to finance and maintain the existing education program, then the IUEC and Otis shall meet to discuss and agree upon whether the amount of the Company's contributions to the Education Plan should be reduced and the wage rate of Elevator Constructor Mechanics, Helpers and Apprentices increased by the amount of any agreed upon reduction.

It is also understood and agreed that if at any time the Trustees of the Education Plan shall advise the IUEC and Otis that the Education Plan does not have sufficient funds to maintain the existing education program, then the IUEC and Otis shall meet to discuss and agree upon whether the amount of the Company's contribution to the Education Plan shall be increased. In no event shall the Company's contribution exceed the lowest contribution paid by any Employer contributor to the Education Plan.

## ARTICLE XX

## ELEVATOR INDUSTRY WORK PRESERVATION FUND

**Par. 1.** The Elevator Industry Work Preservation Fund shall be funded by a contribution of ten cents ($.10) per hour allocated from the first year gross increase as set forth in Article V, Par. 2, and continued each year thereafter for each hour of work performed by each employee covered by this Agreement to the Elevator Industry Work Preservation Fund (except as modified by Article V, Par. 3). Except for the transfer of contributions described in Section 5 below, the monies of the Fund shall be at all times segregated from other Union or Employer assets, and shall not be used or

controlled by the Union or Employers party to this Agreement, but shall be administered solely by the Trustees and its duly authorized representatives for the purposes permitted.

**Par. 2.** The Fund shall be governed by a written Trust Agreement and administered by a Board of Trustees, in accordance with, and so provided in, the governing documents of the Fund and subsequent amendments thereto.

**Par. 3.** The assets of the Fund shall be used for any purpose authorized by Section 6(b) of the Labor-Management Cooperation Act of 1978 and Section 302(c)(9) of the Taft Hartley Act, 29 U.S.C. Section 186(c)(9). The Fund shall not be used for any other purpose, including a purpose which is inconsistent with the provisions of the Standard Agreement, or used for the purpose of funding any lobbying effort or participation in any litigation, or administrative proceeding in which the Fund is seeking or supporting a result which is contrary to the interests of any Employer signatory to the Standard Agreement, or used in connection with an organizational campaign to organize any employees of an Employer which is bound by the terms of this Standard Agreement in a job classification other than the classifications of Elevator Constructor Mechanic, Elevator Constructor Helper and Elevator Constructor Apprentice.

**Par. 4.** No Employer signatory to the agreement shall be obligated to provide information to the Union or to the Fund with respect to any matter which the Fund may be reviewing or pursing or otherwise related to the activities of the Fund, nor shall any Employer signatory to the agreement be obligated to participate in any of the activities of the Fund in any other manner. The Trustees of the Fund shall not take any action which directly or indirectly changes any of the Articles or intent of the agreement, nor shall any provision



of this Article be construed to change the meaning or intent of any other Article of the Otis Agreement.

**Par. 5.** Contributions to the Elevator Industry Work Preservation Fund will be reported on and transferred on a monthly basis using the Monthly Remittance Report to the National Elevator Industry Benefit Funds (NEIBF), which will in turn segregate and deposit the contributions to the Work Preservation Fund in that Fund's separate account.

## ARTICLE XXI

### Payment for Lost or Stolen Tools

**Par. 1.** The Company agrees that they should make every effort to provide a reasonably safe place for tools and likewise the employee shall make every effort to protect not only his own tools but also to protect the Company tools. The Company and the local union agree to jointly reimburse Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices for tools lost on the job or stolen while in transit or stolen from any vehicle being used by the employee on the following basis:

a) Up to a maximum claim of $200, the Company will pay 75% and the local union will pay 25%.

b) On claims of more than $200, the local union will pay $50 with the remainder, up to a maximum of $900, paid by the Company.

Alternatively, the Company may elect to list those tools which its employees are required to utilize. In that event the Company shall not be required to reimburse its employees for other than those tools it shall require.

Actual receipts for replacement tools must be submitted, in either case, to the local union and the Company by the Employee claiming the loss before reimbursement can be

authorized. The local union and the Company reserve the right to inspect replacement tools.

## ARTICLE XXI (A)

### Metric Tools

When and if the Company requires the use of metric tools by an employee in the course of his employment, the Company agrees, upon receipt from the employee, to reimburse the employee for all tools required or to provide such tools, at the Company's option.

## ARTICLE XXII

### Hiring, Layoffs and Transfers

**Par. 1.** In the interest of maintaining an efficient system of production in the industry, providing for an orderly procedure of employment of applicants and of preventing discrimination because of age, citizenship, disability, race, color, creed, sex, religion or national origin, the parties hereto agree to the following system of employment:

(a) The Union shall establish, maintain and keep current an open list for the employment of workmen qualified to perform the duties required. Such list shall be established, maintained and kept current on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, Union By Laws, regulations or constitutional provisions or any other aspect or obligation of Union membership, policies or requirements. Upon request such list shall be made available to the Company for inspection.

(b) The Company shall hire experienced mechanics, helpers and apprentices who permanently live in the area,



are seeking employment and are qualified to perform the work required by the Company before hiring a transient employee or a new inexperienced employee. An employee shall be considered a transient until he makes a showing that he is permanently changing his home and residing in the territorial jurisdiction of the local with which he has registered for referral. The employee shall verify the change by providing to the local, a motor vehicle registration and drivers license with the new address. The employee shall send the change of address to the International in order to be registered with the local for referral. Provided the foregoing criteria are met, an employee's status as a transient shall continue for a period of six (6) months from the time he has registered with the local. When hiring an experienced mechanic, helper or apprentice the Company shall use the Union as the first source of applicants for employment. Upon the Company's request, the Union shall refer, on the basis set forth hereinafter, such an applicant within a period of 72 hours after such request, exclusive of Saturdays and Sundays. If the Union fails to refer qualified workmen within the specified period the Company may obtain workmen from any other available source. The Company has the right to reject any and all applicants referred to it by the Union. The Company, where requested by the Union, shall give, in writing, the reason for any rejection. It is further understood and agreed that if any workman is continually rejected by the Company within a local union's jurisdiction or if the Company, as a matter of practice, repeatedly rejects applicants referred by the Union, the local union Business Representative or the Company may submit the matter of rejection to the Regional Manager, Field Employee Relations and IUEC Regional Director. Failing agreement, the matter may be referred to the National Arbitration Committee under Article XV. The Regional Manager, Field Employee Relations and IUEC Regional Director, National Arbitration Committee or the impartial arbitrator shall have authority to decide the matter

and impose an appropriate remedy. If they find that the continued rejection of a particular workman was justified, the appropriate remedy may include directing the removal of the named workman from the list for a period of time. If they find that the Company has unreasonably or discriminatorily exercised its right of rejection, the appropriate remedy may include directing that the Company not have a right of exercising his right of rejection for a period of time.

(c) The Union shall refer to the Company only workmen whose names appear on the open employment list and in so doing shall be governed by the following criteria:

(1) If the Company requests by name from the open employment list a particular workman previously employed by the Company, who permanently lives in the area, that workman shall be referred by the Union to the Company unless the workman is unwilling to accept employment with the Company.

(2) If the Company requests by name from the open employment list a particular workman who has not previously been employed by the Company, who permanently lives in the area, that workman shall be referred by the Union to the Company unless the workman is unwilling to accept employment with the Company.

(3) In the event the General President of the IUEC shall be of the opinion that a severe unemployment situation exists in any local's jurisdiction, he shall contact the Director, Industrial Relations and confer with him as to the problem and possible resolutions. Failing agreement the matter may be submitted to the impartial arbitrator as provided under Article XV An agreement as to resolution of the problem between the General President of the IUEC and the Director, Industrial Relations or the decision of the arbitrator may modify the provisions of subparagraph (1) and (2) above as may be deemed necessary under the circumstances.

(d) All Employment Practice provisions are to be posted in the Union Hall and in the Company's Personnel Office.



(e) As soon as practical the General President of the IUEC shall review all locals of the Union where there is a part-time Business Representative for the purpose of determining whether such Business Representative is able to establish and maintain an open employment list and to operate the procedures in this Article in a satisfactory manner. He shall then advise the Director, Industrial Relations as to such determination and if there is any disagreement, they shall endeavor to resolve the matter. Failing agreement, the matter may be submitted to the impartial arbitrator provided under Article XV.

**Par.2.** Applicants for apprenticeship shall be evaluated and ranked in accordance with the selection procedures contained in the pattern affirmative action plan set forth in appendix [B] to this agreement, or such similar procedures adopted to conform to applicable state laws or regulations, by local committees consisting of representatives of IUEC Local Unions and Employers signatory to this collective bargaining agreement. Employers seeking new employees shall contact the appropriate local committee for dispatch of an apprentice in accordance with that committee's referral procedures.

**Par. 3** When an Employer makes layoffs, the probationary apprentice will be laid off first. Thereafter, any transient helper, then any transient apprentice, followed by any helper who permanently lives in the area. Thereafter, a first year apprentice. Thereafter, a second year apprentice. Thereafter, a third year apprentice and thereafter, a fourth year apprentice. The employer will determine the order of lay off in each classification. Employees laid off shall be paid at the next weekly payroll period following the layoff.

The temporary mechanic shall be set back in the same order as mentioned in Article X, Par.4 prior to layoff of a transient mechanic, not including temporary transfers referred to in paragraph (4) below, and lastly those mechanics who permanently live in the area will be laid off.

**Par. 4.** The Company shall have the right to transfer temporarily from one local union's jurisdiction to another, key mechanics (such as adjustor, certified welder, mechanic-in-charge, experienced escalator mechanic, mechanic trained to handle special equipment such as hydro drilling equipment, mechanic required to train or orient other employees in that local union's jurisdiction as to the Company's equipment, mechanic transferred temporarily to open an office). A mechanic-in-charge is only on a construction or modernization job where there are four (4) or more Elevator Constructors including the mechanic-in-charge. In addition, where the Company does not have a regular work force, the Company shall have the right to transfer mechanics temporarily on a one-to-one basis in the case of two (2) man jobs up to a maximum of three (3) such jobs at any given time. It is understood that the foregoing limitations shall not be applicable where there are no qualified mechanics available in the local union. Mechanics temporarily transferred under the above provisions may remain in the area only until completion of their work on the particular job for which they have been transferred.

Otis and the IUEC shall mutually decide upon what is a regular work force as used in this Par. 4 and that decision shall become incorporated in and a part of this Agreement.

**Par. 5.** Where the Company is opening a new office in one local union's jurisdiction they may permanently transfer one mechanic from the jurisdiction of another local union to start the new office provided they have advised the Business Representative in advance of the transfer. The Company may



permanently transfer an employee from one local union to work in the jurisdiction of another local union subject to the following conditions:

(a) Prior notice shall be given to the International Union.

(b) The Company shall consider the following factors in reaching a decision to transfer such an employee:

1. The availability of qualified personnel in the other local union.

2. The business necessity for such a transfer and other relevant considerations.

(c) The Company shall not permanently transfer any employee for the purpose of circumventing an expense agreement.

(d) Any dispute concerning such a transfer shall be subject to the grievance and arbitration procedure herein.

(e) It is understood and agreed that prior to terminating an employee for unsatisfactory performance who is to be replaced under this paragraph or any other employee, the Company will give a written warning to the employee with a copy to the Business Representative in order that the employee be given an opportunity to improve his work performance. Such a termination may be submitted as a grievance to the National Arbitration Committee as provided under Article XV as a final source of appeal.

**Par. 6:** Whenever a building owner or other customer of the Employer requires persons working on its premises to provide personal identification as a condition of entering or working on the premises, the Employer will provide the employee with such identification for use on such jobs which will not contain the employee's Social Security, driver's license or any other personal identification numbers of the employee.

## ARTICLE XXIII

### Scope and Terms of Agreement

**Par. 1.** This Agreement shall be binding upon the Company, and the local unions which are named in the attached lists. This Agreement shall be incorporated in and become a part of any Agreement entered into between the Company and the local unions of the International Union and no local Agreements between the Company and local unions shall be made changing this Agreement except as herein provided for in Article XXVI. No local union shall, through its by-laws, constitution, or otherwise, change any of the Articles or intent of this Agreement. Nor shall the Company make any rules or issue any instructions that are contrary to this Agreement.

This Agreement defines the entire relationship between the parties for the term of this Agreement and, except as herein specifically provided for, neither party shall during the term of this Agreement have any obligation to bargain with respect to any matter not covered by this Agreement nor concerning any change or addition hereto.

## ARTICLE XXIV

### Re-Opening Clause

**Par. 1.** The Company and the Union agree that if the Labor Management Relations Act of 1947 is repealed, modified or amended in any respect, the Union and the Company agree that upon service of a thirty (30) days notice by either party, this contract may be reopened for negotiation dealing with Union security or secondary strikes, that will be covered by the repeal, modification or amendment of that Act.



## ARTICLE XXV

### Termination of Agreement

**Par. 1.** This Agreement shall become effective on the Ninth day of July 2002, and shall terminate at midnight on the Eighth day of July 2007.

## ARTICLE XXVI

### Local Option

**Par. 1.** It is agreed between the Company and the Union that in order to more effectively compete or to address other local conditions to benefit the entire elevator industry, it is permissible for any local union to negotiate special conditions with the Company for the following classes of work, except that the wage rate as determined by Article V of this Agreement may not be changed:

1. Modernization Work
2. General Repairs
3. Contract Service
4. Construction Work

Special conditions include but are not restricted to such items as terms associated with Local Transportation and Expense Agreements, work jurisdiction associated with Article IV of this Agreement, staffing, premium rates of pay, shift work or working hours on Modernization, Construction, Repair and Contract Service. In the case of Contract Service, special conditions shall also include problems arising because of areas where an employee's physical well-being may be in jeopardy.

**Par. 2.** The above mentioned special conditions shall be negotiated by a Committee of two (2) Representatives from

the local Union, one (1) International Representative and three (3) Representatives from the Company and their decisions shall be binding on both parties.

**Par. 3.** Agreement on special conditions shall continue as long as satisfactory to both parties, but no change shall be made more often than six (6) months except that changes in construction working hours may be changed more often if mutually agreed. Sixty (60) days notice in writing shall be given by the party desiring such changes and such written notice shall constitute cause for a meeting of both parties.

**Par. 4.** Both parties commit to making an earnest effort to reach an agreement, however, when the Local Union Representative and the Company's designated representative are unable to resolve a dispute over changes in the Local Option Agreement as provided in this Article, either party may request the General President of the IUEC and the Director, Industrial Relations to review, make recommendations or issue guidelines to resolve the dispute.

## ARTICLE XXVII

### Reporting Time Subpoenaed Witnesses, Uniforms

**Par. 1.** Whenever a Mechanic, Helper or Apprentice covered by this Agreement reports to work on a construction, service or maintenance job on request of the Company and there is no work available, except for reasons beyond the control of the Company, the employee shall receive two hours pay at straight time rates.

**Par. 2.** Any employee who is covered by this Agreement who is subpoenaed to court by the Company or by the Company's Counsel shall be paid for all time at the straight time hourly wage rate, fringe benefits, and all reasonable expenses.



**Par. 3.** When required by the Company, Elevator Constructor Mechanics, Helpers and Apprentices shall wear uniforms bearing the Company's name and/or trademark. Such uniforms shall be furnished by the Company at no cost to the employee.

**Par. 4.** Whenever the Company asks an employee to work with cleaning solvents or other materials and substances that pose a risk to life or health, the Company will first advise the employee of the risks and train the employee in proper use or handling of the materials and substances. The contents of all such materials and substances and their possible risks and adverse effects shall be clearly marked on their containers. Suitable protective clothing and equipment must be provided to employees handling such materials and substances.

IN WITNESS WHEREOF, the parties hereunder have set forth their hand and seal on the date stated above.

**Otis**

By:

Ellen McGroary

Robert McGuinness

Patrick Heaney

Elizabeth Ceriello

Ernest Lowe

**INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS**

By:

Dana A. Brigham,
General President

James H. Chapman, Jr.,
Assistant to the General President

Kevin P. Stringer,
General Secretary - Treasurer

Mike Avery,
Labor Committee

James K. Bender II,

Labor Committee

Dale E. Coalmer,
Labor Committee

Michael J. Langer,
Labor Committee

George Lodes,
Labor Committee

Doyle Lumpkins,
Labor Committee

Bernie F. Carey,
Regional Director

Tim Smith,
Regional Director

William R. Johnston, Jr.,
Secretary-Treasurer, IUEC Local #5

Larry J. McGann,
Assistant National Director, EIWPF

Don McQuillan,
Director of Organizing



**LOCAL UNIONS
OF
INTERNATIONAL UNION OF
ELEVATOR CONSTRUCTORS**

Local No. 1, New York, NY
Local No. 2, Chicago, IL
Local No. 3, St. Louis, MO
Local No. 4, Boston, MA
Local No. 5, Philadelphia, PA
Local No. 6, Pittsburgh, PA
Local No. 7, Baltimore, MD
Local No. 8, San Francisco, CA
Local No. 9, Minneapolis, MN
Local No. 10, Washington, DC
Local No. 11, Cincinnati, OH
Local No. 12, Kansas City, MO
Local No. 14, Buffalo, NY
Local No. 15, Milwaukee, WI
Local No. 16, New Orleans, LA
Local No. 17, Cleveland, OH
Local No. 18, Los Angeles, CA
Local No. 19, Seattle, WA
Local No. 20, Louisville, KY
Local No. 21, Dallas/Fort Worth, TX
Local No. 23, Portland, OR
Local No. 24, Birmingham, AL
Local No. 25, Denver, CO
Local No. 27, Rochester, NY
Local No. 28, Omaha & Lincoln, NE and Council Bluffs, IA
Local No. 30, Memphis, TN
Local No. 31, Houston, TX
Local No. 32, Atlanta, GA
Local No. 33, Des Moines, IA
Local No. 34, Indianapolis, IN
Local No. 35, Albany, NY

Local No. 36, Detroit, MI
Local No. 37, Columbus, OH
Local No. 38, Salt Lake City, UT
Local No. 39, Providence, RI
Local No. 41, Springfield, MA
Local No. 44, Toledo, OH
Local No. 45, Akron, OH
Local No. 48, Charleston, WV
Local No. 49, Jacksonville, FL
Local No. 51, Richmond, VA
Local No. 52, Norfolk, VA
Local No. 55, Peoria, IL
Local No. 59, Harrisburg, PA
Local No. 62, Syracuse, NY
Local No. 63, Oklahoma City, OK
Local No. 64, Knoxville, TN
Local No. 71, Miami, FL
Local No. 74, Tampa, FL
Local No. 79, Little Rock, AR
Local No. 80, Greensboro, NC
Local No. 81, San Antonio, TX
Local No. 83, Tulsa, OK
Local No. 84, Reading - Allentown, PA
Local No. 85, Lansing, MI
Local No. 91, New Haven, CT
Local No. 93, Nashville, TN
Local No. 124, Mobile, AL
Local No. 126, Honolulu, HI
Local No. 131, Albuquerque, NM
Local No. 132, Madison, WI
Local No. 133, Austin, TX
Local No. 135, Charlotte, NC
Local No. 138, Poughkeepsie, NY
Local No. 139, Orlando, FL
Local No. 140, Phoenix - Tucson, AZ



# APPENDIX "A"

## Decisions of the Joint Industry Committee

The following decisions of the Joint Industry Committee were included as Appendix A to the Standard Agreement between NEII and the IUEC which expired on July 8, 2002. Otis and the Union recognize these decisions as binding during the term of the present Agreement, except to the extent any of these decisions are in conflict with changes made to Article IV or Article IV (A) during negotiations for the present Agreement.

### 1. Wiring of Car Stations

After due consideration of all the information that the Executive Board could gather, back as far as 1948, it was the decision of the Board that the Manufacturers be permitted to do the internal wiring in the car stations to a terminal block within the car station.

### 2. Pre-Drilled Overhead Beams

Decision arrived at was that Otis would refrain from drilling holes on the bottom flange of the eye beam used to support the deflector sheave as soon as it was possible to stop the production line.

### 3. Pre-Wiring of Controllers

On the protest registered over the pre-wiring of controllers, the employers agreed that the pre-wiring of cross connections on controllers would be discontinued and in the future, auxiliary panels would go out without any leads for any wiring on them.

The employers further agreed that there would be no objection to a local removing the wiring, and replacing it, until the situation is corrected.

**4. Multi-Wire Cable**

The ruling of the Board was that the use of multi wire cable has become prevalent throughout the Industry and they can find no objection to its use.

**5. Key Hole Slots**

A review of past decisions and precedent established the fact that it had been previously agreed that keyhole slots provided in car and/or landing doors are not a violation of Article IV of the Standard Agreement.

Also, it is found that it had previously been agreed that holes provided in the factory for mounting of interlocks, safety edges, detectors and photocells, are not a violation of Article IV of the Standard Agreement.

When Door Closer arms, lazy arms, or relating arms are fastened to the doors by means of drilled and/or tapped holes on the door such drilling and tapping shall be done in the field by Elevator Constructors. In cases where doors are delivered to the job site, pre-drilled or tapped for such devices as referred to in this paragraph, doors will not be installed until a satisfactory settlement between the employer and the Union is made.

**6. Escalators**

It is agreed that the escalator truss or parts of truss maybe used as a shipping container for escalator components, such as tracks, sprockets, etc. Such components shall be secured within the truss with only sufficient fastenings to provide safe transit and shall not be permanently aligned.

It shall not be a requirement that tracks be removed from the truss prior to final alignment.

Connections between the straight inclined track system and the upper and lower end curved track systems shall be made in the field by Elevator Constructors.

Upper and lower sprockets or carriages are to be installed in the field by Elevator Constructors. See Article IV, Par. 2, Item C for additional information.



**7. Extended Wiring On Controllers**

Controllers are not to be shipped from the factory with extended wiring attached thereto.

In the case of escalator controllers, because of limited space available, extended wiring in the form of cables or separate wires may be connected at one end to the controller in the factory provided, however, that the other end of such extended wiring is not prepared for connections.

**8 Plug-in Connections Door Protection**

Prepared plug-in connections for door protection devices such as furnished on the photobell protection device is not a violation of Article IV of the Standard Agreement.

**9. DMR Plug-in Connection**

The plug connection presently being used on the DMR Regulating Unit will be discontinued. Factory installed wires leading out of the regulator shall have the loose ends unprepared for field connection by the Elevator Constructor.

It is agreed that the employer will use up present stock of regulators equipped with plugs. However, any regulators installed on new jobs after July 1, 1964, will be prepared as described in the above paragraph.

**10. Car Door Operators**

Haughton Type 'T' and 'TH' and Westinghouse Type 'E' and other similar car door operators shall have the external wiring to the motor and the door or gate contact installed in the field by Elevator Constructors.

**11. Wood Flooring**

When wood flooring on elevator platforms, including stage lifts, organ consoles and orchestra elevators, is to be installed in the field the work shall be done by Elevator Constructors.

**12. Door Operators**

(1) The pattern for the Industry, for shipping door operators would be based on the practice in existence at the time of the Joint Industry Committee's decision of December 12, 1963.

(2) As a guide for present and future Joint industry Committees, it was determined that the following Exhibits would be used to settle any future dispute relative to the shipping of door operators and would be construed as examples of the practice in existence in December 9 - 12, 1963.

Exhibit 'A' (Haughton 'T' Operator as per photo dated 12/13/67)
Operators may be shipped as per this Exhibit except all external wiring, all Greenfield, all Greenfield connectors and the gate switch shall be removed.

Exhibit 'B' (Haughton 'TH' Two-speed Operator as per photo dated 12/13/67)
Operators may be shipped as per this Exhibit except all external wiring, all Greenfield, all Greenfield connectors and the gate switch shall be removed.

Exhibit 'C' (Haughton 'TH' Center-opening Operator as per photo dated 12/13/67)
Operators may be shipped as per this Exhibit except all external wiring, all Greenfield, all Greenfield connectors and the gate switch shall be removed.

Exhibit 'D' (Westinghouse 'E' Line Operator as per photo 500581A, dated 12/13/67)
Operators may be shipped as per this Exhibit except all external wiring, all Greenfield, all Greenfield connectors and the magnetic locks shall be removed.



Exhibit 'E' (Dover Operator per photo dated 12/13/67)
Operators may be shipped as per this Exhibit except all external wiring, all Greenfield, all Greenfield connectors, the gate switch and the cams to actuate the safety edges shall be removed.

**13. Pre-Assembling of Machine to Machine Beams (Armor Elevator Co.)**

It was agreed by the Joint Industry Committee that the Armor Elevator Company is in violation of Article IV, Paragraph 2, sub-item "g" of the Standard Agreement by the method of pre-assembling the machine to the machine beams and the pre-drilling of the governor mounting plate.

**14. Holes Drilled in the Factory for the Mounting of Sight Guards**

shall not be considered a violation of Article IV of the Standard Agreement. The installation (and tapping if required), shall be done in the field by Elevator Constructors.

**15. Type M Hoistway Door Track Assembly (Haughton Elevator Company)**

It was mutually agreed that the spirator would be removed and that the pre-drilling and tapping was covered by Decision #1 of the Joint Industry Committee dated December 12, 1963.

**16. Pre-Fastening Booster or Blocking Beams to Machine Beams (General Elevator Company of Baltimore)**

The Joint Industry Committee finds that General Elevator of Baltimore method of pre-fastening booster or blocking beams, as established and shown on Exhibit 'A' entitled "Standard Machine Beam Detail with Booster Beam" dated May 7, 1968 is not a violation of Article IV.

**17. Dover Leveling Switches**

Dover Leveling Switches, as they are now constructed, are not a violation of the Standard Agreement.

**18. Westinghouse and Otis Basement Machines**

Westinghouse Basement Type #28 Geared Machine with deflector sheave attached as per DS Sheet 274D and Otis Basement Type 16BT machine with attached deflector sheave as per sheet 6588G are not in violation of Article IV of the Standard Agreement.

**19. Top Emergency Exit Switches (Otis)**

It was agreed that the switch could be removed in the field and remounted.

**20. Otis Integral Hanger**

That the primary function and responsibility of both the Union and the Industry is to assure a safe, reliable and workmanlike installation as regard door equipment. The employers agree that they cannot object to the dismantling of components if such becomes necessary to accomplish this.

(It continues:) There has been some question on interpretation of this clause, therefore, it has been agreed that the application of this decision requires that the mechanic-in-charge use his discretion with regard to removal of the hanger bar to accomplish the stated objective. Management supervisors should not be critical or attempt to penalize the mechanic for using such discretion but if he questions the decision, it should be adjusted between the Construction Manager and the Local Business Representative.

At the 1954 meeting of the International Executive Board and the Manufacturers' Labor Committee, it was mutually agreed that:

The Executive Board believes that when Article IV, Paragraph 8, that states "NO restrictions shall be imposed as to methods, tools, or equipment used" was written in the



Standard Agreement, neither party, at the time, had in mind lethal tools. therefore: we believe the members of the International Union have a perfect right to refuse to use explosive powered tools.

**21. Cargo Masters 500 lbs. up to 1000 lbs.**

All door assembly units must be removed before installation of car.

Pre-wiring of Cargo Master to be limited to door and ejector operation.

Ejector unit must be shipped separately.

The above conditions apply specifically to the Cargo Master with a capacity of 500 lbs. to 1000 lbs. as manufactured by Guilbert, Inc., and are not to be applied to the D/W provision of Article IV, Paragraph 3, Item 3, of the Standard Agreement.

**22. Procedure For One Man Pressure Relief Valve Test**

At a meeting of the National Arbitration Committee held on February 8, 1984, at the Sheraton Bal Harbour, Bal Harbour, Florida, it was jointly agreed that pressure relief valve test work may be performed by one mechanic so long as the following procedure is followed:

Item 1. The elevator must be equipped with a quick release coupling to which a pressure gauge could be connected.

Item 2. The Elevator Constructor mechanic is to be supplied with a temporary run button (the cable is to be of a length which would permit the Elevator Constructor to position himself outside of the machine room or the hoistway while performing the test).

Item 3. With the elevator at the top floor, doors closed, shut off the main line disconnect.

Item 4. Disconnect one wire, which places the elevator on inspection, add one jumper on the directional limit, one jumper on the final limit, and connect the temporary run button to the appropriate terminals.

Item 5. Connect the pressure gauge to the quick release coupling.

Item 6. Put in the main line disconnect and position yourself outside of the machine room and/or hoistway and using the temporary run button, run the elevator up against the stop ring until you observe (hear) the bypass valve open.

Item 7. After checking the pressure gauge the mechanic is to open the bottom hoistway door and observe the cylinder and pipe for possible damage or leakage.

Item 8. If damage has occurred it will be repaired in the normal manner using a repair crew.

Item 9. The car will then be restored to normal service and observed as it runs the first few trips.



## Letters of Agreement

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

This is to confirm the understanding and agreement reached at the recent contract negotiations between the Company and the Union.

It is understood and agreed that where a man has worked for more than one company and has worked at least 1750 hours entitles him to the minimum vacation pay guaranteed by Article XII. The obligation to pay minimum Vacation Pay shall be prorated between all the companies for whom the man worked based upon the hours the man worked for each company. The determination regarding a proration shall be made as of the end of the Vacation year December 31.

Very truly yours,
Robert McGuinness

AGREED:
Dana Brigham

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

At our recent contract negotiations the parties agreed that effective July 9, 2002 as part of the national Otis Management Training Program, the Company shall have the right to work up to twelve (12) salaried non-bargaining unit employees per year as Temporary Helpers for a total of three to eighteen months duration each with no more than one working per local per year; for which it shall pay $1800.00 per person to the local union and $180.00 per person to the International Union. The International shall be notified as to the names of the trainees and the location of their assignments.

Very truly yours,
Robert McGuinness

AGREED:
Dana Brigham



Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

This is to confirm the understanding and agreement reached at the recent contract negotiations between the Company and the Union, that the International Union of Elevator Constructors will hold Otis harmless in the event of administrative proceedings, arbitrations or litigations involving the applicability and/or enforcement of Article III, Par. 3.

Very Truly Yours
Robert McGuinness

Agreed
Dana Brigham

## MEMORANDUM OF AGREEMENT

This will confirm that during the negotiations for the collective bargaining agreement between Otis and the IUEC to be effective July 9,2002, the parties agreed to the following:

a) In the event that the Company experiences difficulties with employee response to emergency overtime call-backs in any local office, the Company shall inform the local union and the local union shall cooperate with the Company in establishing a call back system. In the event the Company and the local union cannot agree on the establishment of the call back system the Company and the IUEC shall establish a call back system.

b) Employees on contract service shall be required to carry and use beepers or any other designated communication devices that permit them to be contacted and informed of an emergency call while the employee is on the way to work at the beginning of the work day and while the employee is on the way home from work at the end of the work day.

Robert McGuinness

AGREED:
Dana Brigham



## TRADE SECRET AGREEMENT

During the term of my employment with Otis and thereafter, I will refrain from disclosing to other persons or entities, except with Otis consent and for Otis benefit during the course of such employment, any trade secrets or confidential information of the Otis Elevator Company.

I will deliver to or leave with Otis all written and other materials containing Otis Elevator trade secret, confidential, or proprietary information upon termination of my employment.

I acknowledge receipt of an executed copy of this agreement

By: ____________________ ____________________
Employee signature Print name

Date

By: ________________________________
For Otis

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

This will confirm the understanding reached during the recent contract negotiations concerning holidays that fall on Saturday or Sunday and that are celebrated on Friday or Monday, respectively.

The Union agrees that the Employer has an obligation to provide contract service to some of its customers on these Friday or Monday holidays. The Union further agrees that to provide such service it must require contract service employees to work on such days. It is agreed that the Employer shall have the right to schedule employees to work on such days in sufficient numbers needed to perform such work. The Employer agrees that it will make every effort to consider the desires of its employees when employees are scheduled to work such days.

Very truly yours,
Robert McGuinness

Agreed:
Dana Brigham



Mr. McGuinness

Dear Bob:

In our recently concluded negotiations, it was agreed that all new employees hired after the effective date of the collective bargaining agreement would be classified as probationary apprentices. Accordingly, the agreement does not affect the probationary status of existing employees who would still be probationary helpers, having been hired within the six months preceding the effective date of our new agreement.

This is to confirm our understanding and agreement that any individual who is still a probationary helper as of the effective date of our new agreement, will upon the completion of his probationary period, receive 70% of Mechanic's rate, plus fringe benefit and will remain at that rate until such time as he is qualified and meets the requirements as a fourth year apprentice.

AGREED
Dana A. Brigham

AGREED
Robert McGuinness

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

This letter will confirm the transfer policy between the primary and subprimary of the newly merged locals will be as follows:

a) Each merged local becomes a subprimary of the local with which it was merged.

b) The current employees form the permanent bench in each subprimary and primary.

c) The current expense Agreement in each affected local will remain in effect until replaced by a new expense Agreement negotiated between Otis and the IUEC.

d) An employee sent from the primary to the subprimary, or vice versa, on a temporary basis will be paid expenses as required by his/her permanent base expense Agreement.

e) An employee who is transferred on a permanent basis from the primary to the subprimary, or vice versa, and this assignment does not require a household move shall receive four (4) weeks per diem from his/her old location expense Agreement, thereafter he/she is a permanent employee in the new location.

f) An employee who is transferred on a permanent basis from the primary to the subprimary, or vice versa, and does require a household move shall receive six (6) weeks per diem from his/her old location expense



Agreement, thereafter he/she is a permanent employee in the new location.

g) When a person on the bench is hired in the primary and/or subprimary he/she shall be used in the new location by application of paragraphs (d), (e), or (f) above.

h) When an employee is permanently transferred, as outlined in paragraphs (e) and (f) above, he/she is guaranteed a total of six (6) months employment in the new location or he/she will be paid per diem for the entire period less the per diem already paid.

This provision (h) does not apply if the employee is discharged for cause.

Very truly yours,
Robert McGuinness

AGREED:
Dana Brigham

## Wage Merger Letter and Schedule

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

This will confirm the understanding reached during our recent negotiations concerning local unions that may be merged or dissolved by the International Union of Elevator Constructors (IUEC) after January 1, 1992 and until the termination of the Standard Agreement that will expire on July 8, 2007. Otis agrees to meet and discuss the effects of such mergers on a local by local basis. Such discussions shall include but are not limited to hiring, expense agreements and open territory between the merged locals.

There shall be no change in any term or condition of employment under the Standard Agreement or any local expense agreement until such time as the parties reach a mutual agreement as to such changes.

It is further agreed that such discussions are to begin as expeditiously as possible following the conclusion of negotiations for a new Standard Agreement.

Very truly yours,
Robert McGuinness

AGREED:
Dana Brigham



Due to the wage disparity created by merging the following locals, for the benefit of both the Employer and The IUEC, we will use the language on pages 114 through 115 of The 1997-2002 Standard Agreement. Using the increase schedule that we have provided, parity will be achieved for all of the merged locals within 5 years.

| Receiving Local | % To Parity | 1st wage change | 2nd wage change | 3rd wage change | 4th wage change | 5th wage change |
|---|---|---|---|---|---|---|
| 79 Little Rock | 98% | 100% | | | | |
| 55 Peoria | 99.7% | 100% | | | | |
| 33 Des Moines | 97.9% | 100% | | | | |
| 3 St Louis | 90.5% | 92% | 94% | 96% | 98% | 100% |
| 132 Madison | 88.2% | 90% | 92.5% | 95% | 97.5% | 100% |
| 12 Kansas City | 83.2% | 87% | 92% | 97% | 100% | |
| 19 Seattle | 77% | 82% | 87% | 92% | 97% | 100% |
| 44 Toledo | 85.5% | 88% | 91% | 94% | 97% | 100% |
| 4 Boston | 67.5% | 73% | 80% | 87% | 94% | 100% |

## Substance Abuse Letter and Policy

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

RE: Letter of Agreement

Dear Dana:

This memorandum details the agreement between the parties concerning potential conflicts between the Otis Elevator Alcohol and Drug Policy and those policies provided by customers as a precondition for securing contracts for Otis

Otis will continue its practice of applying good faith efforts to apply its own policy. Should these efforts be unsuccessful and a customer insists on implementation of their own policy, Otis may institute such policies to the extent necessary to obtain the work.

Good faith efforts by Otis to avoid using the customer's policy will include:

1. Advising the customer that Otis has agreed with the IUEC to a comprehensive company wide policy that addresses the maintenance of a safe and healthy work environment for its employees, and that it does not wish to apply any additional or different regulations.
2. If written confirmation of the company's position fails to change the customer's position, Otis will attempt to obtain customer approval to as much of its policy as possible.
3. If the customer insists on the complete substitution of its policy for Otis policy Otis shall then seek volunteers to man said jobs.



4. Otis will not discipline, discharge or lay off employees solely due to their refusal to volunteer. However, such employees may be laid off if there is not sufficient other work to which they may be assigned.
5. The IUEC recognizes the importance of securing adequate volunteers and will cooperate in assisting in efforts to secure them.

This agreement shall remain if effect for one year unless extended in writing by the parties.

Otis Elevator Company
Robert McGuinness

## SUBSTANCE ABUSE

**Par. 1.** In order to eliminate substance abuse in the workplace; to assist employees with substance abuse related illnesses, to have a safe workplace and efficient work force. Such Substance Abuse Program shall be subject to the conditions set forth in this Article.

**Par. 2.** The Company may schedule regular drug testing for employees at no less than 6 month intervals. There shall be no random testing for drugs or alcohol for any reason other than stated in Paragraph 6. An employee who refuses to submit to random testing of any kind, for reasons other than stated in Paragraph 6, shall not be disciplined, nor shall that employee be refused access to the jobsite.

**Par. 3.** Testing may be performed on new-hire applicants for employment as a condition of employment prior to placing them on the payroll. However, bargaining unit members ( i. e. employees who have already worked in the industry) must be exempt from any such pre-employment testing.

**Par. 4.** An employee may be tested when probable cause exists to believe that the employee is impaired on the job. Probable cause will be deemed to exist under the following circumstances;

(a) The employee's conduct or actions indicating alleged impairment shall be observed by one supervisor on the jobsite and confirmed by a second supervisor whenever possible. The supervisor(s) shall record their observations in writing stating the date, time, length of observation, jobsite and actions of the employee which they believe constitute



drug or alcohol impairment. Such statements shall be signed; and

(b) A determination is made that the employee's conduct is symptomatic of alcohol or drug impairment by an independent physician or health care professional qualified to make such a determination, following a consultation with the employee. The physician or health care professional shall be of the Employer's choosing and the cost of such consultation and determination shall be borne by the Employer if it is not covered by applicable insurance; or

(c) Any employee involved in an accident which results in professional medical treatment or damage to company property will be required to submit to a test for the presence of alcohol or drugs. This requirement will be waived when the injury or accident was solely the result of a third party's action, or where it can be determined that drugs or alcohol were not a contributing factor.

**Par. 5.** An employee who is properly requested to undergo testing in accordance with the minimum procedures set forth in item 4 above shall be tested within 24 hours. If the employee refuses, then the employee is subject to disciplinary action up to and including termination.

The Company must use a recognized and reputable concern for testing, with sufficient facilities and quality control features to ensure accuracy in test diagnosis and the capability to store samples. Chain of custody procedures must be observed at all times. The Company will comply with any state laws concerning drug testing.

The results of the test of an employee who tests positive the first time must be confirmed by NIDA standards. An employee who disputes positive results shall have the right

within ten (10) working days of when he is notified of the test results to have his initial sample independently retested by an authorized laboratory of his choice at his own expense. If the independent retest indicates a negative result, the Employer may elect to retest the employee's initial sample. If the results are again negative, the employee will be put back to work immediately (if he is off work) and made whole for any loss of pay occasioned by the first positive test results.

**Par. 6.** An employee whose final test results are positive (and who has not tested positive previously) will be referred to the Company's Medical Review Officer, (see attachment). Employee Assistance Program or some other recognized and approved rehabilitation or counseling program. The cost of such programs may be offset by appropriate insurance coverage. If the employee enters such a program, his status as an employee will not be affected and he will be allowed access to the job under the conditions established by the program. An employee who refuses a proper request to enter and participate in such a program shall be barred from returning to work with the Company. Employees may be disciplined, up to and including discharge, for subsequent positive test results. Employees who test positive two (2) times, and have been discharged by the Employer, shall not return for the Company until he/she has successfully completed a substance abuse program. Said individual, upon returning to work, may be randomly tested for substance abuse for a period of one year at the employer's expense.

**Par. 7** Testing may be for drug or alcohol impairment only and not for any other medical conditions. Neither the Company nor any medical or testing personnel, shall disclose any information regarding the fact of testing or the results of testing to any other employer or customer. All test



results and related information will be given the same confidentiality as any other medical information in the company.

**Par. 8.** Any employee(s) who possesses, sells, transports or distributes illegal drugs or unauthorized alcohol at a work site, on the company premises, or on company time is subject to immediate discharge.

This statement of principles shall apply to all employees represented by the International Union of Elevator Constructors. Substance abuse testing and treatment measures are appropriate for all employer non-bargaining unit employees as well, including company executives and officers

## RIGHTS OF EMPLOYEES

a) Before requesting an employee to undergo drug or alcohol testing, the employer shall provide the employee with a form on which to acknowledge that the employee has seen the drug and alcohol testing policy.

b) If an employee tests positive for drug or alcohol use, the employee must be given written notice of the right to explain the positive test and indicate any over-the-counter or prescription medication that the employee is currently taking or has recently taken and any other information relevant to the reliability of, or explanation for, a positive test.

c) Within three (3) working days after notice of a positive initial test result the employee may submit information to the employer, in addition to any information already submitted under paragraph (b), to explain that result.

d) An employee who tests positive will have ten (10) working days following the date which the employee is notified of the test result to advise the company, in writing, of the employee's desire to request a retest of the original sample at the employee's own expense.

e) Unless a positive test result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

f) The employer will bear the costs of all testing except for retests requested by employees after an initial positive test result.

Refusal to test or provide an adequate sample when required by this policy shall constitute insubordination and is a violation of this agreement.

Any specimen altered by the employee will be considered a positive test result and therefore a violation of this policy. Any specimen altered by the employer will be considered a negative test result.

MEDICAL REVIEW OFFICER. The Company will appoint a Medical Review Officer (MRO) to administer this Policy. The responsibilities of the MRO shall be to:

a) Select and utilize services of a testing laboratory that meets one of the criteria for drug testing established by *[Bargainers in local areas will have to decide whether to use U.S. Department of Health and Human Services standards or other state or local law standards for all elements of the program including approved MROs for testing of specimens collected under this Policy.]*



b) Provide specimen test kits and collection locations that follow chain of custody collection techniques mandated by *[adopted standard]*.

c) Maintain appropriate systems, records, and administrative procedures to provide participating employers with accurate and timely information as to the drug and alcohol free status of employees.

d) Ensure that the testing facility conducts both an initial drug screen and a confirmation test on specimens before reporting positive results.

e) Notify the tested individual of a positive result and provide the individual with an opportunity to explain the reasons why their test might be positive.

f) Review and verify a confirmed positive test result and process the donor's request for a confirmatory retest of the original sample.

g) Review a participating employee's medical record if so requested by the employee.

h) Notify the employer's contact person of all test results, both positive and negative, if required.

i) Refer individuals testing positive to the appropriate medical evaluation and participate in return to duty decisions as set forth in this Policy.

j) Ensure the drug and alcohol policy and program complies with *[Federal, State, and local law]*.

UNITED STATES
DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 148186 - SH

February 28, 2008
15:22:38

Civ Fil Non-Pris
USAO #.: 08CV080
Judge..: JANIS L. SAMMARTINO
Amount.: $350.00 CK
Check#.: BC11342

Total-> $350.00

FROM: ANDERSON V. OTIS ELEVATOR CO

BY FAX

ORIGINAL

# CIVIL COVER SHEET

JS 44 (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED

08 FEB 28 PM 3:25

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: DEPUTY

'08 CV 0380 JLS RBB

## I. (a) PLAINTIFFS

Russell Anderson

**DEFENDANTS**

Otis Elevator Company

(b) County of Residence of First Listed Plaintiff San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed ______
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

FREDERICK W. GASTON (SBN 231179)
MATTHEW J. FAUST (SBN 254145)
222 Ash Street
San Diego, CA 92101
Telephone: 619/398-1882; Facsimile: 619/398-1887

Attorneys (If Known)

STACY D. SHARTIN, ESQ. (SBN 58281)
PAUL C. WHITE, II, ESQ. (SBN 213900)
SEYFARTH SHAW LLP
2029 Century Park East, Suite 3300
Los Angeles, California 90067
Telephone: (310) 277-7200; Facsimile: (310) 201-5219

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury—Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

## V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
28 U.S.C. § 1332 (Diversity)

Brief description of cause:
Plaintiff alleges fraud, breach of contract, and misrepresentation related to his employment.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE ______ DOCKET NUMBER ______

DATE
February 28, 2008

SIGNATURE OF ATTORNEY OF RECORD
Stacy D. Shartin

**FOR OFFICE USE ONLY**

RECEIPT # 148186 AMOUNT $180 APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

SA 2/28/08

American LegalNet, Inc. www.USCourtForms.com